IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MAINLINE ROCK & BALLAST, INC., | ) | |
| | ) | No. 35767-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| BARNES, INC., | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. —

*Jim wins.* Complete letter ruling of beloved Benton-Franklin Counties Superior Court Judge Albert J. Yencopal.

Barnes, Inc., a blasting contractor, asked the superior court to vacate an arbitration award issued in a contract dispute between Barnes and a party hiring its services. The superior court instead confirmed the arbitration award. Because the award shows no facial error, we affirm.

## FACTS

The arbitrated dispute arises from a commercial contract for the mining and

crushing of rock. The parties recite facts in their briefs despite the lack of a record from the arbitration hearing. Therefore, we are unable to confirm the accuracy of the facts. We recite some of those facts behind the dispute despite a conclusion that most of those facts lack relevance to this appeal. In the end, we consider only the arbitrator's award important.

Mainline Rock & Ballast, Inc. (Mainline Rock) develops and operates rock quarries to extract, crush, and sell ballast, rock material used as the footing or base for railroad tracks. Mainline Rock's principal place of business is Washington State. Between 2004 and 2017, Mainline Rock owned and operated a rock quarry in Torrance County, New Mexico, near Encino. Mainline Rock intended to sell ballast from the Torrance site to BNSF Railway.

In the process of generating ballast, the crushing operation creates by-product aggregate material and waste or reject material. Some by-product rock material may be sold for use in road construction and other infrastructure projects. The waste material, generally not commercially sellable, consists of dirt screened during the crushing process. Mainline Rock stockpiled the Torrance waste for later use in reclamation of the pit at the quarry.

Barnes, Inc. (Barnes) works as a drilling and blasting contractor with its principal place of business in Idaho. On July 27, 2004, through a cryptic letter of understanding (LOU), Mainline Rock retained Barnes to drill and blast solid rock at the Torrance, New

Mexico site. The LOU declared that Barnes would drill and blast material for railroad and retail sales at a rate of $0.78 per ton. The price included "anticipated rejects [waste material] of approximately 10 [percent] of the material blasted." Clerk's Papers (CP) at 20. This contract provision suggested Barnes would be paid a small amount for waste, but not an amount separate from the price paid for the other blasted material. The contract does not explicitly state that the waste will be separated from the ballast and by-product. Nevertheless, according to the LOU, Mainline Rock expected that BNSF Railway would purchase the waste produced during the first year of operation. We assume a railway occasionally needs fill dirt to shore up its rail lines, but still the record does not explain why BNSF Railway would purchase dirt from Mainline Rock. Under the LOU, if the waste amount proved to be higher than anticipated, Mainline Rock would renegotiate the price.

Under the 2004 LOU, Mainline Rock also agreed to pay Barnes a rate of $1.56 per solid cubic yard of material blasted for site development. The record does not clarify the need, nature, and extent of site development, but we assume site development entailed blasting commercially nonviable areas in order to gain access to the sellable ballast and by-product.

The parties operated under the 2004 LOU until 2008, when the parties executed a master blasting agreement (MBA) for all locations at which Barnes would perform services for Mainline Rock. The 2008 agreement outlined the basic terms and conditions

3

for the drilling and blasting to be performed by Barnes. The MBA did not include terms

and conditions for services performed at a specific location, since the parties would

include those details in work orders. The MBA read:

> Upon acceptance and agreement of a Work Order, Mainline hereby authorizes Barnes to occupy Mainline Locations to operate its Drilling and Blasting operations for Mainline in accordance with the Work Order and this Agreement.

CP at 22.

The MBA's term was three years, but the agreement could be renewed by the

parties. The MBA stated that Mainline Rock would pay Barnes for blasted rock materials

when Mainline Rock sold the rock to a third party:

> **9. Payment Terms**: Unless otherwise noted herein, Mainline agrees to pay for all materials *sold and invoiced*, in full, within 20 days at the end of the month in which the rock is *sold and invoiced*. A late fee computed by a periodic rate of 1.5% per month will be applied to any overdue balance. If Products are for resale, no sales tax will apply.

CP at 23 (bold print in original; italics added). Individual work orders would determine

the rate of payment.

The 2008 MBA did not reference the 2004 LOU. The 2008 agreement contained

an integration or merger clause that declared:

> **26. Entire Agreement**: This writing is intended by the parties to be the final, complete and exclusive statement of their Agreement relating to the matters covered herein. There are no other oral understandings, representations or warranties affecting it.

CP at 29. Paragraph 27 of the agreement read:

4

> **Governing Law:** This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Washington. Or as required by law to be in the state of a specific operation.

CP at 29. The MBA included an arbitration clause that read, in part:

> **25. Arbitration and Waiver of Jury Trial:** The parties hereby select binding arbitration as the exclusive method for resolving any dispute arising out of or otherwise relating to this Agreement, whether based on contract, tort, statute, or otherwise. To the extent not inconsistent herewith, arbitration shall be conducted in accordance with the Washington State Arbitration Act, RCW 7.04 et seq.

CP at 28. Finally, paragraph 29 of the MBA declared:

> **Attorney Fees**: If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney fees, court costs and out-of-pocket costs, in addition to any other relief to which the party may be entitled. The provisions of this section shall survive the termination or expiration of this Agreement.

CP at 29.

On June 1, 2008, Mainline Rock and Barnes entered a work order authorization for blasting work at the Torrance County location. The work order would be continued "as needed." CP at 31. The 2008 work order directed Mainline Rock to pay Barnes for its drilling and blasting services at $ 0.87 per ton. The work order further declared:

> **7.0  Special Terms and Conditions**. Quantity shall be measured and paid as sold. Barnes retains the Drilling and Blasting interest in by-products stockpiled on-site to be sold at a later date. Barnes['] interest in by-products survives the termination of the Master Drilling and Blasting contract for materials produced from Barnes blasted rock. This is a continuation of Blasting services at an ongoing quarry. The prices paid for blasting of ballast and by-product shall escalate (de-escalate) at the same

percentage rate as applicable to Mainline's ballast supply agreement with BNSF. The value of the blasting interest in by-products or other carried materials shall be equal to the adjusted price at the time of sale. Inventories carried beyond the termination of the master agreement shall be purchased [sic] paid for within 5 years of termination by Mainline.

CP at 31. Neither the MBA nor the work authorization mentioned rejects or waste materials.

In 2016, the parties executed an amendment to the MBA and 2008 Work Order relating to the Torrance County site. The amendment created two different prices for materials. Mainline Rock would pay Barnes the amount of $1.20 per ton for a category of material labeled "Drilling and Blasting 2016 (includes non-rail by-product)." CP at 44. Mainline Rock would pay Barnes $1.00 per ton for a second category of material entitled "Commercial by-product by rail shipped to CSA and Vulcan." CP at 44. The amendment did not identify "CSA." The first category constituted ballast Mainline Rock could sell to BNSF and rock by-product that could be sold as commercial aggregate products for delivery by truck. The second category included rock by-product blasted by Barnes and sold by Mainline Rock as commercial aggregate products that could be sold and delivered in large volumes by rail car.

According to Mainline Rock, Barnes drilled and blasted for Mainline Rock, between 2004 and 2017, and Mainline Rock paid Barnes based on the blasted materials actually sold. During the thirteen years, Mainline Rock never paid Barnes for reject or

waste material, and Barnes never made a request for such payment. According to Barnes, it never requested payment for the waste because the waste had yet to be sold.

In December 2016, Mainline Rock notified Barnes of an anticipated sale of its Torrance County operation site. Mainline Rock disclosed that it planned to include in the sale stockpiled materials, which sale would trigger a payment to Barnes for the stored commercially sellable materials. Mainline Rock conducted three discrete drone surveys of the stockpiled materials, each which calculated a quantity of 2.8 million tons of material. Mainline Rock announced that, on closing of the sale, it would pay Barnes $2.8 million based on a rate of $1.00 per ton. In response, Barnes, based on pre-blast measurements, expressed its belief that Mainline Rock possessed 6 million tons of stockpiled materials. Barnes demanded to be paid based on a quantity of 6 million tons. According to Mainline Rock, Barnes unreasonably demanded payment for waste and reject materials.

On April 7, 2017, Mainline Rock sold its Torrance County operation site to Vulcan Materials Corporation. The sale included all stockpiled commercially sellable aggregate inventory. Barnes suggests the sale also included stockpiled waste, which makes sense since the waste probably sat on the sold real estate. Barnes further suggests that the waste had been separated from rock by the time of the sale. Nevertheless, neither party provides any evidence to show that the separated rejects or waste sat on the land at the time of sale. Barnes' contentions imply that the purchase price of the quarry reflected

7

a sum for the stockpiled waste, although neither party provides evidence as to whether or not the buyer paid a separate sum for waste material.

On May 17, 2017, Mainline Rock sent Barnes payment of $908,596. Mainline Rock lowered the sum from its anticipated payment of $2.8 million based on its unilateral determination that 1.9 million tons of stockpiled material was unsellable waste. Barnes responded that Mainline Rock owed it payment for 5.65 million tons of stockpiled material at $1.25 per ton because the unit price per ton increased to $1.25 in 2017. In short, Barnes demanded payment of $7,062,500. The parties differed in amount owed by $6,156,904.

Pursuant to their 2008 master blasting agreement, the parties submitted their dispute to arbitration before a three-member panel of arbitrators. A majority of the panel determined that Barnes was entitled to an additional payment of $354,839.50 beyond the $908,596.00 already tendered. The language of the majority's ruling looms critical for this appeal. The award reads:

> This matter having come before the arbitration panel for hearing on May 22-24, 2017, and the arbitration panel having considered the evidence presented by both Mainline Rock & Ballast, Inc., the Claimant, and Barnes, Inc., the Respondent, the arbitration panel presents its majority arbitration award as follows:
> 1. By-Product Inventory On-Hand (original): The panel awards Barnes Inc. the amount of $206,848.50 calculated (827,394 tons x $0.25/ton).
> 2. By-Product Inventory On-Hand (corrected): The panel awards Barnes, Inc. the amount of $78,872.50 calculated as follows: (65,158 tons by-product x $1.25 = $81,447.50) less ballast overpay calculated as: (2,060

8

tons x $1.25 = <$2,575.00>) for adjusted total calculated: ($81,447.50 - $2,575.00=$78,872.50).

3. By-Product Inventory Loose Under Jaw: $40,547.50 (32,438 tons x $1.25/ton).

4. Drilling Holes by Barnes: The panel awards Barnes, Inc. the amount of $28,571.00 for 109 drill holes drilled but not shot prior to the Vulcan sale calculated as follow: ($41,400.00 billed by Barnes, Inc. less $12,829.00 paid by Mainline = $28,571.00).

5. Attorneys Fees and Costs: Under the facts and circumstances, the arbitration panel determines that neither party is a prevailing party and, therefore awards no attorney's fees or costs to either party.

6. Total Majority Award to Barnes, Inc: **$354,839.50.**

A summary of the majority's award is as follows:

1. The majority concludes that the unit price negotiated between Mainline and Barnes in June 2008 was inclusive of anticipated reject material. This conclusion is supported by the parties' course of performance and treatment of reject material from the time the quarry was established in 2004 up through the sale to Vulcan in April 2017. In particular, by letter dated July 27, 2004, Barnes specifically noted that its negotiated unit price was inclusive of anticipated reject material. Barnes re-affirmed this understanding in its February 7, 2006 letter. Accordingly, the unit price Barnes negotiated and agreed to in June 1, 2008 Work Order Authorization (i.e., $0.87/ton) was inclusive of anticipated reject material. This was the purpose for having a unit price based on tons sold as opposed to a contract based on solid cubic yards blasted.

2. The majority concludes that Barnes was owed $1.25/ton for the rock by-product inventoried and on-hand. Although Mainline argued that the price should be $1.00/ton based on a volume sale to Vulcan, the majority finds that the unit price of $1.00/ton would only have applied had that by-product inventory been actually rail shipped to Vulcan (or CSA). As it was, the by-product remained stockpiled and inventoried at the quarry on the date of the Vulcan sale and, therefore, it was non-railed by-product to be paid at the unit price of $1.25/ton.

3. The majority concludes that any rock or by-product materials used as foundation fill beneath the jaw crusher should be included in the final inventory, with payment due to Barnes for the estimated 32,428 tons.

4. The majority concludes that Barnes' billed price of $41,400 was a reasonable charge for the time and expense incurred by Barnes to drill the

9

109 holes which were drilled but not blasted. The majority finds that $12,829.00 paid by Mainline would not fully compensate Barnes for the time and materials needed to drill the 109 holes.

5. With regard to both parties' request for an award of attorney's fees and costs, the majority concludes that, while both parties prevailed in part, neither party is the prevailing party for the purpose of awarding attorney's fees and costs. Therefore, the majority makes no award of attorney's fees and costs in favor of either party despite having made a monetary award to Barnes. Mainline and Barnes will share equally in the costs of the arbitration.

6. Any and all further claims or requests for relief of any type by either Mainline or Barnes in this arbitration are denied with prejudice.

CP at 80-82.

Barnes criticizes the majority award, at least in part, for not awarding a separate sum for waste, when the award stated that Barnes would be paid for the reject material. We do not know if Mainline Rock, in part, reads the award as including payment for the waste as part of the overall unit price per ton. Mainline Rock contends that Barnes was not entitled to separate payment for the waste as demonstrated by its failure during the previous thirteen years to demand payment. We note that the parties never agreed to pay a discrete sum per ton of waste material. Nor did any of the parties' agreements mention separating the waste material from the ballast and by-product for purposes of calculating a separate payment for the waste.

One arbitration panel member dissented. The dissenter wrote:

Arbitrator H. Kent Magleby, P.E. dissents from the majority award as follows:
1. Total adjusted product and by-products stockpiled on-site.
   a. Ballast inventory = 52,638 Tons

10

b. By-product inventory recognized by Mainline Rock and Ballast Inc. (Mainline) = 892,552 Tons

c. By-Product inventory measured but not recognized by Mainline - 2,581,423 Tons (Averaged from 3 drone surveys)

d. Total product and by-product = 3,526,613 Tons

2. Adjusted price at the termination of the agreement.

a. $1.25 per Ton

3. Barnes, Inc. (Barnes) interest in products and by-products stockpiled on-site:

a. $4,408,266.25

4. Amount previously paid by Mainline

a. $908,596.00

5. Net amount still owed to Barnes

a. $3,499,670.25

6. There is insufficient information to determine that the by-products have all been sold, therefore, I recommend it be treated as inventory carried beyond the termination of the master agreement and paid for within 4 years in four equal yearly payments.

I offer the following in support of the above dissenting settlement amount:

1. Only the Master Blasting Agreement dated June 1, 2008, the work authorization dated June 1, 2008, and the Amendment dated June 1, 2016 apply to this dispute, previous letters of understanding or other correspondence are superseded by the agreement and are not relevant.

2. Based upon the testimony of the parties to the agreement, it is clear that the by-product in stockpile that was measured and excluded by Mainline was to be sold at a later date.

3. Mainline did not negotiate in good faith with Barnes when they determined that a portion of the by-product could not be sold at a later date, rather they measured it and completely excluded it. This is a violation of the agreement both written and as intended.

4. Mainline applied a unit price to the by product in stockpile that was associated with a specific sale that never materialized. This is a violation of the agreement both written and as intended.

5. There is no provision in the agreement for by-products not stockpiled on the site; therefore, Barnes cannot expect payment for them.

6. The multiple drone surveys are an accurate means of determining the amount of material in stockpile on the site.

7. The conversions from volume to weight utilized by Mainline

failed to account for moisture in the stockpile; however, Barnes did not
provide alternate conversions.

  8. There is no provision in the agreement for drilling only;
therefore, it is a separate dispute that should not be resolved the Arbitration
Board.

  9. Both parties failed to correctly interpret and apply the special
terms and conditions of the agreement (Exhibit "A" Work Order
Authorization Paragraph 7.0), therefore, neither party prevailed and there is
no award of Attorney Fees (Master Blasting Agreement Paragraph 29).

CP at 83-84.

## PROCEDURE

Barnes filed a motion with the superior court seeking vacation of the arbitration

award.  Barnes argued that the arbitration panel erroneously considered evidence as to the

parties' contracting intent beyond the 2008 master blasting agreement and the work

authorization.  Barnes also argued that the arbitration panel committed error by failing to

award it pre-award interest and reasonable attorney fees under the terms of the MBA.

Mainline Rock opposed the motion and filed a motion to confirm the arbitration award.

The trial court denied Barnes' motion to vacate the award and granted Mainline Rock's

motion to confirm the award.

## LAW AND ANALYSIS

On appeal, Barnes argues, pursuant to RCW 7.04A.230(1)(d), that the arbitration

panel exceeded its powers when committing three errors.  First, the panel erred by

considering the 2004 LOU and the parties' course of performance when determining the

parties' agreement.  Second, the panel erred by not awarding reasonable attorney fees to

Barnes when it was the prevailing party and the MBA contained an attorney fees clause. Last, Barnes argues it was entitled to interest on the award in Barnes' favor since the agreement required payment of interest on past due sums at 18 percent per annum. For each claimed error, Barnes asserts the facial legal error doctrine. A similar analysis applies to each claimed error, but we address each argument separately.

Amount of Award

Because the parties engaged in interstate commerce, this appeal implicates the Federal Arbitration Act, 9 U.S.C. § 1 et seq. Nevertheless, neither party cites federal law or asks for application of the Federal Arbitration Act. Washington law will not result in a different outcome. *Satomi Owners Association v. Satomi*, *LLC*, 167 Wn.2d 781, 803, 225 P.3d 213 (2009). Therefore, we rely on Washington arbitration principles.

Courts will only review an arbitration decision in limited circumstances. *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, 167 Wn.2d 428, 434, 219 P.3d 675 (2009). Review of an arbitration award at the trial court and on appeal is limited to statutory grounds. *Barnett v. Hicks*, 119 Wn.2d 151, 153-54, 829 P.2d 1087 (1992).

RCW 7.04A.230 governs this appeal. The statute addresses confirmation or vacation of an arbitration award. The statute declares, in relevant part:

> (1) Upon motion of a party to the arbitration proceeding, the court shall vacate an award if:
> . . . .
> (d) An arbitrator exceeded the arbitrator's powers;
> . . . .

13

(4) If a motion to vacate an award is denied and a motion to modify or correct the award is not pending, the court shall confirm the award.

Like other parties to arbitration who challenge the merits of a ruling of an arbitration panel, Barnes relies on RCW 7.04A.230(1)(d)'s language of "[a]n arbitrator exceeded the arbitrator's powers." We question whether this language should extend to the substance of arbitral rulings. In common and legal parlance, committing factual or legal error does not equate to the decisionmaker exceeding its power. Exceeding power goes more to jurisdiction of an arbitration panel rendering a decision on a dispute or issue never submitted to it. In *Boyd v. Davis*, 127 Wn.2d 256, 897 P.2d 1239 (1995), an astute concurring opinion disagreed with the majority applying the facial legal error principle as being based on an earlier version of Washington's arbitration statute. The current language of the statute omits any reference to error of law.

We follow Washington Supreme Court precedent and proceed on the basis that a party may successfully challenge an arbitration award based on legal error. Nevertheless, a successful challenge lies only in very limited circumstances, and those circumstances do not apply to Barnes' challenge since Barnes fails to show legal error on the face of the award. Limiting the circumstances fulfills the policy and purposes behind arbitration.

Our litigious society encourages parties to voluntarily submit disputes to arbitration. *Davidson v. Hensen*, 135 Wn.2d 112, 118, 954 P.2d 1327 (1998); *Boyd v. Davis*, 127 Wn.2d at 262 (1995). Arbitration seeks to avoid the formalities, delay,

14

expense, and vexation of litigation in court. *Davidson v. Hensen*, 135 Wn.2d at 118.

Arbitration is attractive because it is a more expeditious and final alternative to litigation.

*Boyd v. Davis*, 127 Wn.2d at 262. Arbitration's desirable qualities would be heavily

diluted, if not expunged, if a trial court reviewing an arbitration award were permitted to

conduct a trial de novo. *Boyd v. Davis*, 127 Wn.2d at 263.

Arbitrators, when acting under the broad authority granted them by both the

agreement of the parties and by statute, become the judges of both the law and the facts.

*Northern State Construction Co. v. Banchero*, 63 Wn.2d 245, 249-50, 386 P.2d 625

(1963). In fact, the arbitration act does not require that the arbitration panel enter any

findings of fact or conclusions of law. *Barnett v. Hicks*, 119 Wn.2d at 156 (1992).

Based on RCW 7.04A.230(1)(d), arbitrators are deemed to have exceeded their

authority when the face of the arbitration award exhibits an erroneous rule of law. *Broom

v. Morgan Stanley DW Inc.*, 169 Wn.2d 231, 239-40, 236 P.3d 182 (2010); *Davidson v.

Hensen*, 135 Wn.2d at 118 (1998); *Boyd v. Davis*, 127 Wn.2d at 263 (1995); *Northern

State Construction Co. v. Banchero*, 63 Wn.2d at 249-50. Conversely, unless the award

on its face shows the adoption of an erroneous rule or mistake in applying the law, the

award will not be vacated or modified. *Beroth v. Apollo College, Inc.*, 135 Wn. App.

551, 559, 145 P.3d 386 (2006); *Northern State Construction Co. v. Banchero*, 63 Wn.2d

at 249-50 (1963). The facial legal error standard is a very narrow ground for vacating an

arbitral award, and courts may not search the arbitral proceedings for any legal error.

15

*Broom v. Morgan Stanley DW Inc.*, 169 Wn.2d at 239 (2010). The party seeking to vacate the award bears the burden of showing such grounds. *Cummings v. Budget Tank Removal & Environmental Services, LLC*, 163 Wn. App. 379, 388, 260 P.3d 220 (2011).

As of 2010, Washington courts had applied the facial legal error standard carefully, vacating an award based on such error in only four instances. *Broom v. Morgan Stanley DW Inc.*, 169 Wn.2d 231 (2010). For example, facial error was present when the arbitrator identified a portion of an award as punitive damages in a jurisdiction that does not allow punitive damages. *Salewski v. Pilchuck Veterinary Hospital Inc.*, 189 Wn. App. 898, 904, 359 P.3d 884 (2015). In *Broom v. Morgan Stanley DW Inc.*, the Supreme Court vacated an arbitration award dismissing a claim under securities law for a broker's breach of fiduciary duty, because the award applied a state statute of limitations and, under Washington law, statutes of limitations do not apply in arbitration.

In *Federated Services Insurance Co. v. Personal Representative of the Estate of Norberg*, 101 Wn. App. 119, 124, 4 P.3d 844 (2000), this court vacated an award. The arbitration panel awarded an estate of one killed in a car accident damages for a loss of potential inheritance on the assumption he would survive his parents. The panel expressly invited the court to rule on its award and segregated the sum for the award from the awards for other damages.

16

Other principles important to our decision emanate from the facial legal error

doctrine. Courts do not look to the merits of the case, and they do not reexamine

evidence. *Broom v. Morgan Stanley DW Inc.*, 169 Wn.2d at 239. An arbitration award

shall not be vacated if the appellant's argument cannot be decided without delving into

the substantive merits of the claim. *Davidson v. Hensen*, 135 Wn.2d at 121 (1998). The

error must be recognizable from the language of the award. *Federated Services*

*Insurance Co. v. Personal Representative of the Estate of Norberg*, 101 Wn. App. at 124

(2000). We do not address mistakes of law not found on the face of the award. *Kitsap*

*County Deputy Sheriff's Guild v. Kitsap County*, 167 Wn.2d at 434-35 (2009). We do not

reach the merits of the arbitrator's legal conclusions. *Clark County Public Utility District*

*No. 1 v. International Brotherhood of Electrical Workers*, 150 Wn.2d 237, 239, 76 P.3d

248 (2003). We do not even review the arbitration decision under an arbitrary and

capricious standard. *Yakima County v. Yakima County Law Enforcement Officers Guild*,

157 Wn. App. 304, 318, 237 P.3d 316 (2010).

Because we review only the arbitration award, we may not examine contract

language relevant to the dispute. *Boyd v. Davis*, 127 Wn.2d at 260-61 (1995). We do not

review an arbitrator's interpretation of a contract. *Cummings v. Budget Tank Removal &*

*Environmental Services, LLC*, 163 Wn. App. at 389-90 (2011).

We note that in *Broom v. Morgan Stanley DW Inc.*, 169 Wn.2d 231 (2010) and

*Boyd v. Davis*, 127 Wn.2d 256 (1995), the Supreme Court analyzed some of the language

in the underlying contracts, despite the latter decision declaring that the court should not review the contract. Still the review of the contract language did not lead to a vacation of the arbitration decision. In *Cummings v. Budget Tank Removal & Environmental Services, LLC*, 163 Wn. App. at 389-90 (2011), this court affirmed an arbitration award because the final award did not show on its face that the arbitrator misunderstood the law of contracts or adopted an erroneous rule.

We follow the rule that the court may not review contract language not quoted in the arbitration award. Analyzing the contract language goes beyond facial error, possibly entails an intricate review of the merits of the case, and conflicts with the goal of avoiding extensive and expensive litigation.

We note inconsistencies in Washington decisions as to whether a court may consider language in the arbitrator's decision beyond the arbitration's actual judgment in favor of one party when determining facial legal error. According to one line of cases, the arbitrator's reasons for the award are not part of the award itself. *Expert Drywall, Inc. v. Ellis-Don Construction, Inc.*, 86 Wn. App. 884, 888, 939 P.2d 1258 (1997); *Lindon Commodities, Inc. v. Bambino Bean Co., Inc.*, 57 Wn. App. 813, 816, 790 P.2d 228 (1990); *Westmark Properties, Inc. v. McGuire*, 53 Wn. App. 400, 403, 766 P.2d 1146 (1989). In *Westmark Properties*, this court narrowed its review to two sentences of the arbitrator's three-page letter.

According to another line of decisions, when a final award sets forth the arbitrator's reasoning along with the actual dollar amounts awarded, any issue of law evident in the reasoning may also be considered as part of the face of the award. *Cummings v. Budget Tank Removal & Environmental Services*, *LLC*, 163 Wn. App. at 389 (2011); *Federated Services Insurance Co. v. Personal Representative of the Estate of Norberg*, 101 Wn. App. at 124-25 (2000); *Tolson v. Allstate Insurance Co.*, 108 Wn. App. 495, 32 P.3d 289 (2001). Other decisions go further and announce that the court may even review some paper delivered by the arbitrator with the award. *Boyd v. Davis*, 127 Wn.2d at 262 (1995); *School District No. 5 v. Sage*, 13 Wash. 352, 357, 43 P. 341 (1896); *Lent's, Inc. v. Santa Fe Engineers, Inc.*, 29 Wn. App. 257, 265, 628 P.2d 488 (1981); *Moen v. State*, 13 Wn. App. 142, 145, 533 P.2d 862 (1975). For purposes of argument sake, we review all three pages of the arbitration panel majority members' decision for legal error. We do not go beyond the three pages.

Barnes contends that the face of the award from its arbitration panel shows error because the award mentions an earlier letter. In fact, the award mentions two letters: a letter dated July 27, 2004, known as the LOU, and a February 7, 2006 letter, in which Barnes reaffirms some understanding. According to Barnes, mention of the letters establishes that the panel breached the master blasting agreement integration clause. Nevertheless, the integration clause is nowhere mentioned in the arbitration panel ruling. During oral argument, Barnes suggested that we include the dissenting arbitration panel

member's written decision as part of the "award," for purposes of determining a facial

legal error. In *Keen v. IFG Leasing Co.*, 28 Wn. App. 167, 622 P.2d 861 (1980), the

court in passing noted that it reviewed the dissenting arbitrator opinion when assessing

whether the panel had addressed all disputes before it. We find no Washington or foreign

decision that directly addresses this question, however. We doubt that the dissenting

opinion should be considered, since the dissenter's conclusions had no influence on the

award and the dissent could misstate or misconstrue the basis of the majority's ruling.

Nevertheless, we need not decide this question, since, even if we consider the arbitration

panel dissent's writing, our conclusion would not change.

Barnes contends that the language of the dissenting opinion confirms that the

majority breached the integration clause. The dissenting arbitrator wrote that the master

blasting agreement dated June 1, 2008, the work authorization dated June 1, 2008, and

the amendment dated June 1, 2016, supersede and render irrelevant any previous letters

of understanding or other correspondence. Nevertheless, we observe that a later

agreement can supersede any earlier agreement or understanding simply by being a later

agreement and without the later agreement containing an integration clause. We further

note that the dissenter, in paragraphs 3 and 4 of his second page, implied that the contract

lacks a merger clause because the writing refers to the parties' intent outside of the

language of the MBA and the work authorization.

20

We also observe that Barnes relies on extrinsic evidence when promoting its

reading of the MBA.  In its opening brief, Barnes writes:

> At the time of the LOU, both parties intended that Barnes was to be paid for all of the rock blasted, including the so-called "reject" materials.  CP 4, 20.  This was the parties understanding because Mainline had promised Barnes that all such "reject" materials would be sold to the railroad or other entities which were located in Texas, due to a shortage of crushed materials there.  Id.  There was no intention to have any substantial stockpiles on site.  CP 5.

Br. of Appellant at 3.

Finally, we note that the master blasting agreement integration paragraph reads

that the agreement constituted the final, complete, and exclusive statement of the parties'

agreement.  We wonder how an arbitration panel resolves a dispute as to the parties'

agreement, if the MBA in fact does not include language that resolves the dispute or if

the agreement contains an ambiguity that cannot be resolved by other language in the

agreement.  The MBA integration clause does not expressly preclude the arbitration panel

from considering other evidence.

Barnes also argues that the panel did not decide the critical question of the total

tonnage of commercially sellable by-product materials contained within the stockpiles at

the Torrance site.  The arbitration award, however, lists tonnage of by-product inventory

on hand and multiplies that number by a rate to conclude how much money Mainline

Rock owed Barnes.  The dissenting arbitrator also lists the number of tons of various

inventory such as ballast and by-product.

21

Barnes contends that the sale of reject material to Vulcan belies the arbitration panel's apparent belief that the waste was commercially unsellable. We see no language in the arbitration panel award that the majority deemed waste unsellable.

We note a hazard in Washington law. An arbitration panel improves its chances of court confirmation of the award by providing no reasoning or analysis behind its award. For example, the Mainline Rock-Barnes arbitration panel could have, in the path of Judge Albert Yencopal, simply wrote: "We award Barnes $354,839.50." Nevertheless, the parties may benefit by knowing the reasoning applied by the panel when reaching its decision. Still, the parties surrender some rights to a thorough decision and thorough appellate review when agreeing to expedite resolution through arbitration. The parties could insert in their arbitration clause a requirement that the arbitrator or arbitration panel provide a detailed and reasoned decision.

In addition to vacating an arbitration award based on facial legal error, Washington courts will remand an arbitration award to the arbitrator when an ambiguity needs clarification. *Tolson v. Allstate Insurance Co.*, 108 Wn. App. 495 (2001); *Lindon Commodities, Inc. v. Bambino Bean Co.*, 57 Wn. App. at 816 (1990). Barnes claims no ambiguity in the arbitration panel's award.

Interest

Barnes next contends that the arbitration panel erred by not granting it pre-award interest. Barnes cites to the master blasting agreement clause granting it interest on

22

unpaid amounts. For the same reason that we refuse to vacate the award of damages, we decline to remand for an award of interest. The arbitration panel award does not mention the contract provision.

*Westmark Properties, Inc. v. McGuire*, 53 Wn. App. 400 (1989) and *Cummings v. Budget Tank Removal & Environmental Services, LLC*, 163 Wn. App. at 390 (2011) control. In *Westmark Properties*, this court narrowed its review to two sentences of the arbitrator's three-page letter. The two sentences read:

> . . . I find that the plaintiff is entitled to judgment against the defendants in the sum of $24,789.92, by way of reimbursement.
> . . . I am finding that the balance due the plaintiff for management fees is offset by shortfall in rentals.

53 Wn. App. at 403. On review before the superior court, the court added prejudgment interest to the award. This court reversed. We observed that the superior court went behind the face of the award to discern a basis for awarding interest. The superior court had entered forbidden territory.

In *Cummings v. Budget Tank Removal & Environmental Services, LLC*, the defending party complained in court that the arbitrator erroneously awarded prejudgment interest. Since entitlement to the award depended on the evidence, this court refused to disturb the award because no error appeared on the face of the award.

23

Attorney Fees

Barnes next contends the arbitration panel committed facial legal error by failing

to award it reasonable attorney fees and costs incurred during the arbitration proceeding.

Barnes sought fees under the master blasting agreement provision that afforded the

prevailing party an award of reasonable attorney fees. It claims it prevailed because it

received an award of $354,839.50. Barnes cites to decisions outside the arbitration

context that hold that the plaintiff is the prevailing party for purposes of an award of fees

if the plaintiff recovers a judgment, no matter the sum.

For the same reason that we refuse to vacate the amount of the arbitration award,

we decline to remand for an award of attorney fees incurred during the arbitration

process. In accordance with case law, the arbitrators found neither party to be the

prevailing party and declined to award attorney fees. In addition, the arbitration award

nowhere mentions any contract provision demanding that the prevailing party be awarded

reasonable attorney fees and costs.

Barnes contends that, because the majority discussed who prevailed for purposes

of an award of fees, this court must assume that the master blasting agreement contained

a mandatory provision for an award of reasonable attorney fees. We disagree.

Sometimes attorney fees clauses leave to the arbitrator or the court discretion in awarding

fees. For example, the parties in *Beroth v. Apollo College, Inc.*, 135 Wn. App. at 563

(2006), entered an agreement that provided the arbitrator authority to award "'attorney

fees and such other equitable relief as *may* to the arbitrator be just.'"  (Emphasis added.)

*Phillips Building Co. v. An*, 81 Wn. App. 696, 915 P.2d 1146 (1996) and *Morrell v. Wedbush Morgan Securities, Inc.*, 143 Wn. App. 473, 178 P.3d 387 (2008) govern the question of attorney fees.  In *Phillips Building Co. v. An*, the Ans argued that the arbitrators exceeded their authority by failing to award them attorney fees under the parties' contract since they were the prevailing party.  The arbitrators wrote: "'Each party shall bear its own attorney fees and costs incurred in relation to this arbitration.'"  81 Wn. App. at 700.  The court, contrary to the rule that we do not look to the underlying contract unless cited in the award, noted that arbitrators may exceed their authority by failing to award attorney fees to the prevailing party under an arbitration agreement.  The court also recognized the principle that, if both parties prevail on major issues, there may be no prevailing party.  The court affirmed the denial of the award because the court would need to go outside the face of the award to assess who prevailed.  Although the arbitrators awarded the Ans some damages, the amount deceeded the amount claimed.

The court in *Phillips Building Co. v. An* distinguished *Agnew v. Lacey Co-Ply*, 33 Wn. App. 283, 654 P.2d 712 (1982), on which Barnes relies.  In the latter decision, this court modified an arbitration award because the arbitrators failed to award the prevailing party, Agnew, reasonable attorney fees and costs.  Lacey Co-Ply demanded $1.6 million in arbitration from Agnew, who purchased an industrial furnace from Agnew.  The arbitrators granted Lacey Co-Ply nothing.  The court held that the arbitrators exceeded

their powers when they ignored the express language of the contract between the parties that afforded an award of fees. The court thereby violated the principle that it may not review the parties' contract when the award does not mention the terms of the contract.

This court in *Phillips Building Co. v. An* differentiated *Agnew v. Lacey Co-Ply* because the face of the award in favor of Agnew necessarily declared Agnew to have prevailed on all issues. Both parties in *Phillips Building Co. v. An* prevailed on issues. We question the validity of this court's decision in *Agnew v. Lacey Co-Ply*, but we need not ponder its correctness. The same distinction from *Agnew* lies with Barnes' arbitration panel award.

In *Morrell v. Wedbush Morgan Securities, Inc.*, 143 Wn. App. 473 (2008), the court, as we do, questioned the analysis in *Agnew*. The arbitrator denied the Morrells reasonable attorney fees and costs despite their prevailing at arbitration. The superior court, based on a contract clause, granted the Morrells fees, despite no reference to the attorney fees clause in the arbitration award. This court deemed *Agnew* wrong because the court went behind the arbitration award and engaged in contract analysis. As Barnes does, the Morrells asked the court to apply the facial legal error doctrine because the award analyzed who constituted the prevailing party. The arbitration concluded that since both parties prevailed on such issues, neither party should be awarded fees. This court reversed the superior court's grant of fees to the Morrells.

One might contend that this court acts like an ostrich by refusing to consider a contract provision that affords the prevailing party reasonable attorney fees and costs. But again, the Supreme Court teaches that our role is not to reach the merits, but to only consider the face of the award. This rule promotes efficiency in arbitration.

Fees on Appeal

Mainline Rock asks for an award of reasonable attorney fees and costs incurred on appeal. We grant this request provided Mainline Rock complies with RAP 18.1.

On appeal, Mainline Rock prevails on all issues. RCW 7.04A.250(3) provides for an award of attorney fees and litigation expenses in favor of the prevailing party for postaward proceedings. The statute declares:

> On application of a prevailing party to a contested judicial proceeding under . . . 7.04A.230 [vacation of arbitration award] . . ., the court may add to a judgment confirming, vacating without directing a rehearing, modifying, or correcting an award, attorneys' fees and other reasonable expenses of litigation incurred in a judicial proceeding after the award is made.

We note that Barnes cites to one unpublished opinion in its brief and two unpublished opinions in its statement of additional authorities. We direct Barnes' attention to GR 14.1 and this court's direction in *Crosswhite v. Department of Social & Health Services*, 197 Wn. App. 539, 544, 389 P.3d 731, *review denied*, 188 Wn.2d 1009, 394 P.3d 1016 (2017), which Barnes did not follow.

27

No. 35767-8-III
*Mainline Rock & Ballast v. Barnes, Inc.*

CONCLUSION

We affirm the trial court's confirmation of the arbitration panel award. We award

Mainline Rock reasonable attorney fees and costs on appeal.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, J.

No. 35767-8-III

LAWRENCE-BERREY, C.J. (concurring) — I agree with the lead opinion but write separately to encourage future litigants to argue that RCW 7.04A.230(1)(d) should be construed more narrowly than courts have construed former RCW 7.04.160(4) (1943).

Nearly one century ago, arbitration awards could be vacated if the court found that the arbitrator committed "an error in fact or law." Rem. Comp. Stat. § 424(2) (1922). In 1943, Washington adopted the "Uniform Arbitration Act," and codified it at chapter 7.04 RCW. Former RCW 7.04.160(4) permitted a court to vacate an arbitration award if "[1] the arbitrators exceeded their powers, or [2] so imperfectly executed them that a final and definite award upon the subject matter submitted was not made."

In *Boyd v. Davis*, 127 Wn.2d 256, 267, 897 P.2d 1239 (1995) (Utter, J., concurring), our high court held that a party seeking to vacate an award under former RCW 7.04.160(4) must establish an error of law on the face of the award. Four justices signed the concurring opinion that argued against the majority's standard. The concurring opinion argued that the majority's standard improperly retained a relic of the prior law and did not give the statutory language its full meaning. *Id.* at 266-70.

Because the original act did not address many important questions, it was revised in 2005. Washington adopted the revised act effective January 1, 2006, and codified it at chapter 7.04A RCW.

The National Conference of Commissioners on Uniform State Laws authored a lengthy Prefatory Note to the revised act. The note states in relevant part:

> There are a number of principles that the Drafting Committee agreed upon at the outset of its consideration of a revision to the UAA. . . . [T]he underlying reason many parties choose arbitration is the relative speed, lower cost, and greater efficiency of the process. The law should take these factors, where applicable, into account.

Prefatory Note to chapter 7.04A RCW, ¶ 3.

RCW 7.04A.230(1)(d) is the updated version of former RCW 7.04.160(4). RCW 7.04A.230(1)(d) permits a court to vacate an arbitration award if the "arbitrator exceeded the arbitrator's powers." One notes that the second phrase of former RCW 7.04.160(4) has been entirely omitted. This omission is intentional and serves to further narrow the ability of a court to vacate an arbitration award. Surprisingly, no appellate court has determined what effect this intentional omission has on *Boyd*'s construction of former RCW 7.04.160(4).

As evidenced by this case, arbitration is not final in those cases where the arbitrators assume the burden of explaining their awards to the parties. Explaining an award is a good thing. It allows the nonprevailing party to know that he or she has been heard and that the arbitrators carefully considered facts and arguments. Explaining an award is essential for instilling confidence in the arbitration process. We should not adopt a standard for vacating arbitration awards that discourages arbitrators from explaining their awards. But that is exactly what our courts have done. Although

2

RCW 7.04A.230(1)(d) is intended to be narrow, it is narrow only when an arbitrator narrowly explains the award.

A solid argument can be made that *Boyd*'s construction of former RCW 7.04.160(4) does not survive the intentionally narrower language of RCW 7.04A.230(1)(d). In my view, an arbitrator exceeds its powers only when the arbitrator has decided an issue not properly before it. Should courts eventually adopt this or a similar narrowed standard, RCW 7.04A.230(1)(d) would not permit endless litigation of well-explained arbitration awards.

Lawrence-Berrey, C.J.

3