# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| MICHAEL SALEWSKI, D.V.M., an individual, | ) ) ) | No. 72314-6-I |
| Appellant, | ) ) ) | |
| v. | ) ) | |
| PILCHUCK VETERINARY HOSPITAL, INC., P.S., a Washington corporation, | ) ) ) | PUBLISHED OPINION |
| Respondent. | ) ) ) | FILED: August 31, 2015 |

VERELLEN, A.C.J. — The mutual promises of shareholders are adequate consideration for a noncompete agreement among the shareholders, even if the noncompete takes the form of promises in the shareholders' individual employment agreements. And a liquidated damages clause is enforceable if it reasonably forecasts the unascertainable financial harm that would result from a violation of the noncompete agreement.

Michael Salewski, DVM, does not establish any error on the face of the arbitrator's award that relied upon the mutual promises of the shareholders of Pilchuck Veterinary Hospital, Inc. as the consideration supporting the noncompete agreements signed by each of the shareholders. Neither is there an error on the face of the award in concluding that the $300,000 liquidated damages clause was a reasonable forecast of damages. We affirm.

## FACTS

On December 17, 1992, Pilchuck hired Salewski as an associate veterinarian. That same day, Salewski signed an employment agreement and an agreement not to compete. Sometime between 1998 and 2000, he became a shareholder in the professional services corporation and signed a new confidentiality and noncompete agreement. Subsequently, every time a new shareholder was brought in, a whole new set of documents, including agreements not to compete, were prepared and signed by all the shareholders. Consequently, Salewski signed a total of four noncompete agreements as a shareholder.

The terms of the noncompete agreements changed slightly over time. The agreement at issue here, signed by Salewski and the eight other shareholders on January 1, 2007, stated:

> 3. Agreement Not To Compete. Employee shall not practice veterinary medicine within 50 miles of the corporate offices of Principal during the Non-compete Period [of thirty-six (36) months following Employee's termination of employment with Principal]. Regardless of geographical location, Employee shall not render services to any Pre-existing Client who was a client at any time within the 24 months preceding termination of employment during the Non-compete Period. Each of the parties has reviewed the terms of the Agreement and acknowledges that the terms hereof are necessary for the protection of the Principal and the clients of Pilchuck Veterinary Hospital. The parties further acknowledge that the non-compete provisions contained herein do not create an undue hardship for either Employee or for Principal and are reasonable under the circumstances.
>
> . . . .
>
> 4. Remedies in an Event of Breach. Employee hereby recognizes that irreparable damage will result to Principal and to the business of Principal in the event of breach by Employee by any of the covenants set forth in this agreement. In the event of breach of any of the covenants and assurances contained in this Agreement, Principal shall be entitled to enjoin and restrain Employee from any continued violation of this

2

agreement. This equitable remedy shall be in addition to (and not supercede) any action for damages Principal may have for breach of any part of this Agreement.

> 4.1 Additionally, Employee agrees to pay liquidated damages in the amount of Three Hundred Thousand Dollars ($300,000) for any violation of the covenant not to compete.[1]

This 2007 agreement reflected the same terms as the two noncompete agreements he signed in 2002 and 2005, except that the liquidated damages amount increased from $200,000 in the 2005 agreement to $300,000 in the 2007 agreement.

In 2008, Salewski indicated that he wanted to leave the ownership group. As a result, he and the remaining eight shareholders executed a stock redemption agreement effective December 31, 2008. The agreement provided that "a list or summary of any and all other agreements remaining in effect between Buyer and Seller from and after the date of mutual execution hereof is attached as Exhibit D hereto."[2] Exhibit D listed the noncompete agreement dated January 1, 2007.

Salewski continued to work for Pilchuck as a nonshareholder employee until December 2010, when he announced that he was moving to start a new practice in Oregon. Prior to terminating employment, Salewski met with Pilchuck's chief financial officer and chief executive officer to discuss the provisions of his noncompete agreement. Shortly after, Pilchuck discovered, and Salewski admitted, that he was providing veterinary services within 50 miles of Pilchuck, as well as services for former Pilchuck clients outside the 50-mile radius.

---

[1] Clerk's Papers (CP) at 110.

[2] CP at 323.

3

The parties agreed to arbitrate the enforceability and application of the noncompete agreement and its corresponding liquidated damages provision. The arbitrator issued an award in favor of Pilchuck, concluding that "[t]he covenant not to compete in question is a valid and binding contract, and [Pilchuck] is entitled to judgment or credit in the amount of the liquidated damages of $300,000."[3]

Pilchuck filed a motion in Snohomish County Superior Court to confirm the arbitration award, including attorney fees and costs, and prejudgment interest. Salewski responded with a motion to vacate the arbitration award. After hearing oral argument, the superior court granted Pilchuck's motion to confirm the award and denied Salewski's motion to vacate, entering a judgment in favor of Pilchuck in the amount of $125,855.66,[4] prejudgment interest in the amount of $30,229.20, and statutory costs and attorney fees in the amount of $39,929.91.

Salewski appeals.

## ANALYSIS

Salewski contends that the superior court erred in denying his motion to vacate the arbitration award. He argues the award is erroneous on its face because the noncompete agreement lacked valid consideration and because the liquidated damages provision was an unenforceable penalty. Neither argument is persuasive.

Appellate review of an arbitrator's award is limited to the same standard applicable in the court which confirmed, vacated, modified or corrected that award.[5]

---

[3] CP at 150.

[4] This amount reflects the liquidated damages amount, $300,000, less the amount of the principal owed under the stock redemption agreement note, $174,144.40.

[5] Pegasus Constr. Corp. v. Turner Constr. Co., 84 Wn. App. 744, 747, 929 P.2d 1200 (1997) (quoting Barnett v. Hicks, 119 Wn.2d 151, 157, 829 P.2d 1087 (1992));

4

Judicial review "is confined to the question of whether any of the statutory grounds for vacation exist."[6] The party seeking to vacate the award bears the burden of showing that such grounds exist.[7] "One of the statutory grounds for vacating an award exists when the arbitrator has 'exceeded the arbitrator's powers.'"[8] To vacate an award on this ground, the error must appear "on the face of the award."[9]

The "facial legal error standard is a very narrow ground for vacating an arbitral award."[10] It does not extend to a potential legal error that depends upon the consideration of the specific evidence offered or to an indirect sufficiency of the evidence challenge.[11] Courts are not permitted to conduct a trial de novo when reviewing the award, "do not look to the merits of the case, and they do not reexamine evidence."[12] "'The error should be recognizable from the language of the award, as, for instance, where the arbitrator identifies a portion of the award as punitive damages in a jurisdiction that does not allow punitive damages.'"[13] "Where a final award sets forth the

---

Cummings v. Budget Tank Removal & Envtl. Servs., LLC, 163 Wn. App. 379, 388, 260 P.3d 220 (2011).

[6] Cummings, 163 Wn. App. at 388.

[7] Id.

[8] Id. (quoting RCW 7.04A.230(d)).

[9] Federated Servs. Ins. Co. v. Pers. Representative of Estate of Norberg, 101 Wn. App. 119, 123, 4 P.3d 844 (2000).

[10] Broom v. Morgan Stanley DW, Inc., 169 Wn.2d 231, 239, 236 P.3d 182 (2010).

[11] See Cummings, 163 Wn. App. at 389-90.

[12] Broom, 169 Wn.2d at 239.

[13] Cummings, 163 Wn. App. at 389 (quoting Estate of Norberg, 101 Wn. App. at 123-24).

arbitrator's reasoning along with the actual dollar amounts awarded, any issue of law evident in the reasoning may also be considered as part of the face of the award."[14]

*Noncompete Agreement*

Salewski argues that there is an error on the face of the award because "[t]here is no authority in Washington to support the arbitrator's conclusion that a promise by another shareholder . . . is sufficient consideration for a noncompetition agreement entered into by a different individual after the start of his or her initial employment."[15] We disagree.

Generally, owners of a business entity can agree to reasonable limits on their ability to compete with each other without regard to the terms of their employment. This concept is recognized in *Restatement (Second) of Contracts*: "Promises imposing restraints that are ancillary to a valid transaction or relationship include . . . a promise by a partner not to compete with the partnership."[16] This principle expressly applies both to partnerships and joint ventures,[17] and particularly to professional partners.[18]

---

[14] Id.

[15] Appellant's Br. at 19.

[16] RESTATEMENT (SECOND) OF CONTRACTS § 188 (1981).

[17] RESTATEMENT § 188 cmt. h; 6 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 13:18 (4th ed. 2009).

[18] 2 LOUIS ALTMAN & MALLA POLLACK, CALLMANN ON UNFAIR COMPETITION, TRADEMARKS AND MONOPOLIES § 16:27, at 16-112 to -113 (4th ed. 2009) ("When a covenant not to compete is signed by a true partner in a professional partnership, some courts have recognized that this presents a situation which is entitled to a level of scrutiny intermediate between that which is applicable to an employment and that which is applicable to a sale of a business interest.").

Such noncompete agreements are not uncommon, especially in small business entities where the owners are professionals who are also employees.[19] For purposes of restraints on competition, we see no distinction between the shareholders of Pilchuck and partners or joint venturers who have agreed to restrict their competition with the partnership or joint venture. Most importantly here, the adequacy of consideration should be viewed in the context of the agreement among owners and not merely as an employee/employer relationship.[20] The mutual promises of all the owners of a business are adequate consideration for a noncompete agreement among all the owners.[21]

---

[19] See Emerick v. Cardiac Study Ctr., Inc., 170 Wn. App. 248, 255, 286 P.3d 689 (2012) (explaining that restrictive covenants are common among professionals because they allow a new professional to step into an already established practice while protecting the employer from future competition); see also Columbia Physical Therapy, Inc. v. Benton Franklin Orthopedic Assocs., 168 Wn.2d 421, 430, 228 P.3d 1260 (2010) (concluding that the professional services for which a professional service corporation is incorporated and in which it may therefore engage are those for which the shareholders are licensed); RCW 18.100.010 (the shareholders in a professional services corporation, such as Pilchuck, are all required by statute to be licensed professionals rather than mere passive investors).

[20] See Ashley v. Lance, 75 Wn.2d 471, 475, 451 P.2d 916 (1969) ("In interpreting the partnership agreement, including the restrictive covenant, the agreement must be read as a whole. It must also be construed in the light of the history of the partnership and its purpose.").

[21] See generally id. (holding that in a five-man medical partnership, where a new partnership agreement was signed each time a new partner was added, the plaintiff doctor could invoke the partnership agreement despite being the only remaining partner after four partners left in concert to start a competitive practice); Alexander & Alexander, Inc. v. Wohlman, 19 Wn. App. 670, 682-84, 578 P.2d 530 (1978) (holding that there was adequate consideration to support noncompete agreements made by shareholders as part of the sale of an insurance business); Paula Berg, Judicial Enforcement of Covenants Not to Compete Between Physicians: Protecting Doctors' Interests at Patients' Expense, 45 RUTGERS L. REV. 1, 4 n.14 (1992) ("The requirement of consideration is not particularly problematic in the context of noncompetition clauses ancillary to partnership agreements, because all partners are equally benefitted and burdened by the provision and the parties' bargaining power is presumed to be equal.").

Here, the face of the award reveals the determination by the arbitrator that the shareholders all agreed to and signed new noncompete agreements each time a new shareholder joined the practice.[22] On the face of the award, the arbitrator relied upon the mutual promises of the shareholders as consideration for the noncompete agreements.[23] The agreements here took the form of ancillary promises contained in the individual "employment agreements" between each shareholder and the professional services corporation. But the arbitrator expressly found that new agreements were signed by all of the shareholders each time a new shareholder joined. Accordingly, the mutual agreement of all the Pilchuck shareholders not to compete with the professional service corporation provided adequate consideration for the 2007 noncompete agreement.[24]

Salewski relies upon employment law decisions recognizing that where a noncompete agreement is entered into or modified after employment, mere continued employment does not provide adequate consideration to enforce the agreement because independent consideration is required.[25] But he provides no authority that such limitations apply to the modification of a noncompete agreement mutually entered

---

[22] CP at 147 ("Every time a new owner was brought in as a shareholder of [Pilchuck], a whole new set of documents, including agreement[s] to not compete, were prepared and signed by all.").

[23] CP at 148 ("The promises of the other shareholders were consideration for [Salewski]'s promise. Thus there was a bargained for exchange of promises.").

[24] Here, Salewski was not an employee who acquired a negligible or revocable ownership interest in order to qualify as a partial "owner" of the business for the purpose of enforcing the covenant not to compete. See 2 ALTMAN & POLLACK, supra.

[25] Labriola v. Pollard Grp., Inc., 152 Wn.2d 828, 100 P.3d 791 (2004).

into by all shareholders of a corporation.[26] Thus, there is no legal error revealed on the face of the award. To the extent Salewski suggests that we should somehow evaluate the strength of the evidence that the shareholders mutually agreed and mutually executed identical new "employment agreements" each time a new shareholder joined, that approach would far exceed our narrow review.

The impact of the stock redemption agreement by which Salewski became a former shareholder and employee does not alter our analysis. The redemption agreement expressly provides that the 2007 noncompete agreement continues in effect. The redemption agreement is entirely consistent with the arbitrator's determination that the 2007 agreement continued to apply after the stock redemption.[27]

There is no error on the face of the award. The 2007 noncompete agreement is supported by adequate consideration and applies to Salewski's post-2010 conduct.

---

[26] Consistent with the arbitrator's observations, some courts and commentators recognize that the reason for greater scrutiny in an employee/employer noncompete agreement is the leverage held by the employer in that relationship. See 2 ALTMAN & POLLACK, supra, at 16-113 ("In one such case[,] the court said that a professional partner is like an employee, but does not suffer from the same inequality of bargaining power and impairment of his ability to find subsequent employment."); 10A WILLIAM MEADE FLETCHER & CAROL A. JONES, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 4979, at 52-53 (perm. ed., rev. vol. 2011) ("The rationale behind the distinction in analyzing covenants not to compete is that a contract of employment inherently involves parties of unequal bargaining power to the extent that the result is often a contract of adhesion, while a contract for the sale of a business interest is far more likely to be one entered into by parties on equal footing."); see also RESTATEMENT § 188 cmt. g ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.").

[27] Salewski did not become a mere employee; he was a former shareholder/employee who was owed more than $200,000 under the redemption agreement.

*Liquidated Damages*

Salewski argues that the liquidated damages provision "is not based on any formula and bears no reasonable relation to any actual damage that might befall Pilchuck if a veterinarian were to leave the practice and compete."[28] We disagree.

Washington courts "are loath[ ] to interfere with the rights of parties to contract as they please between themselves."[29]

> It is not the role of the court to enforce contracts so as to produce the most equitable result. The parties themselves know best what motivations and considerations influenced their bargaining, and, while "[t]he bargain may be an unfortunate one for the delinquent party, . . . it is not the duty of courts of common law to relieve parties from the consequences of their own improvidence . . . ."[30]

Liquidated damage clauses "are favored and are enforceable if they do not constitute a penalty or are otherwise unlawful."[31] The arbitrator correctly stated the test for the enforceability of such clauses, that "(1) the amount fixed must be a reasonable forecast of just compensation for the harm that is caused by the breach, and (2) the harm must be such that it is incapable or very difficult of ascertainment."[32]

---

[28] Appellant's Reply Br. at 7.

[29] Mgmt., Inc. v. Schassberger, 39 Wn.2d 321, 326, 235 P.2d 293 (1951).

[30] Watson v. Ingram, 124 Wn.2d 845, 852, 881 P.2d 247 (1994) (alterations in original) (quoting Reichenbach v. Sage, 13 Wash. 364, 368, 43 P. 354 (1896)).

[31] Knight, Vale & Gregory v. McDaniel, 37 Wn. App. 366, 371, 680 P.2d 448 (1984).

[32] Id.

"Harm resulting to one business from the competition of another business is difficult to estimate accurately."[33] The main inquiry is "whether the specified liquidated damages were reasonable at the time of contract formation."[34]

> The reasonableness of liquidated damages is not determined retroactively by their correspondence with actual damages, but by reference to the prospective difficulty of estimating the possible damages that would flow from a breach. . . . The greater the prospective difficulty of estimating possible damages, the greater the range of reasonableness used in assessing a liquidated damages provision.[35]

Here, the arbitrator determined that the 2007 agreement to pay $300,000 for violation of the noncompete agreement was a reasonable forecast of damages. This agreement was negotiated and signed by all of the shareholders. As the arbitrator observed, it "was not something rammed down the throat of an employee" by someone with unequal bargaining power.[36] We do not go beyond the face of the award to evaluate the evidence that was before the arbitrator. The face of the award reveals no legal error. To the extent Salewski's arguments imply that there could not have been adequate evidence to support the arbitrator's determination that $300,000 was a reasonable forecast of damages, such an inquiry would require us to go behind the face of the award to consider evidence not before us.[37]

Accordingly, there is no error on the face of the arbitration award.

---

[33] Id.; Walter Implement, Inc. v. Focht, 107 Wn.2d 553, 559, 730 P.2d 1340 (1987).

[34] Watson, 124 Wn.2d at 853.

[35] Id.

[36] CP at 150.

[37] We note that the amount that would likely be owing to a redeemed shareholder could be considerable, more than $200,000 in this case. Such a factor might be a valid consideration in forecasting the harm if a redeemed shareholder chooses to breach the noncompete agreement.

*Attorney Fees*

Lastly, Pilchuck contends it is entitled to attorney fees and costs as provided in the noncompete agreement. In Washington, reasonable attorney fees may be awarded when authorized by a contract.[38] "A contract which provides for attorney fees to enforce a provision of the contract necessarily provides for attorney's fees on appeal."[39] Here, the noncompete agreement provides that "[s]hould the Principal be the prevailing party in any action to enforce this Agreement (Contract) the Principal shall be entitled to all attorneys' fees and costs incurred enforcing its right under this Agreement."[40] Pilchuck remains the prevailing party and thus, is entitled to an award of reasonable attorney fees and costs on appeal upon compliance with RAP 18.1.

We affirm.

_____
Cox, J.

WE CONCUR:

Trickey, J.

---

[38] Marine Enters, Inc. v. Sec. Pac. Trading Corp., 50 Wn. App. 768, 771, 750 P.2d 1290 (1988).

[39] Id. at 774.

[40] CP at 111.