**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientslawareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>           Respondent/Cross Appellant,<br><br>        v.<br><br>AMERICAN TOBACCO CO.,<br><br>           Defendant,<br><br>COMMONWEALTH BRANDS INC.; COMPANIA INDUSTRIAL de TABACOS MONTE PAZ, SA; DAUGHTERS & RYAN, INC.; FARMERS TOBACCO CO.; HOUSE OF PRINCE A/S; ITG BRANDS, LLC, JAPAN TOBACCO INTERNATIONAL USA, INC.; KING MAKER MARKETING INC.; KRETEK INTERNATIONAL; LIGGETT GROUP LLC; P.T. DJARUM; PETER STOKKEBYE TOBAKSFABRIK A/S; PHILIP MORRIS USA, INC.; R.J. REYNOLDS TOBACCO COMPANY; REEMTSMA CIGARETTENFABRIKEN GMBH; SANTA FE NATURAL TOBACCO COMPANY; SCANDINAVIAN TOBACCO GROUP LANE LIMITED; SHERMAN'S 1400 BROADWAY NYC, LLC; TOP TOBACCO, LP; VON EICKEN GROUP; and WIND RIVER TOBACCO CO. LLC,<br><br>           Appellants/Cross-Respondents. | No. 84265-0-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

For the current opinion, go to https://www.lexisnexis.com/clientslawareports/.

No. 84265-0-I/2

SMITH, C.J. — The United States Supreme Court has repeatedly

recognized Indian tribal governments' inherent sovereign power to tax.[1]  That

inherent sovereign power is at the heart of this case.

In the 1990s, several states, including Washington, sued major cigarette

manufacturers, seeking to protect the public health and gain compensation for

costs incurred from treating smoking-related illnesses.  The participating

manufacturers (PMs) and the states settled their dispute in the late 1990s and

entered into a Master Settlement Agreement (MSA), which requires the

manufacturers to make annual cash payments to the states in perpetuity.  To

keep non-participating manufacturers from evading liability, Washington State

(State) enacted chapter 70.157 RCW, which requires all tobacco manufacturers

---

[1]  See, e.g., Washington v. Confederated Tribes of Colville Indian
Reservation, 447 U.S. 134, 153, 100 S. Ct. 2069, 65 L. Ed. 2d 10 (1980) (" 'Chief
among the powers of sovereignty recognized as pertaining to an Indian tribe is
the power of taxation.' " (quoting Powers of Indian Tribes, 55 Interior Dec. 14, 46
(1934)); Montana v. United States, 450 U.S. 544, 565, 101 S. Ct. 1245, 67 L. Ed.
2d 493 (1981) ("To be sure, Indian tribes retain inherent sovereign power to
exercise some forms of civil jurisdiction over non-Indians on their reservations,
even on non-Indian fee lands.  A tribe may regulate, through taxation, licensing,
or other means, the activities of nonmembers."); Merrion v. Jicarilla Apache
Tribe, 455 U.S. 130, 137, 102 S. Ct. 894, 71 L. Ed. 2d 21 (1982) ("The power to
tax is an essential attribute of Indian sovereignty because it is a necessary
instrument of self-government and territorial management. . . . [I]t derives from
the tribe's general authority, as sovereign, to control economic activity within its
jurisdiction."); Rice v. Rehner, 463 U.S. 713, 722, 103 S. Ct. 3291, 77 L. Ed. 2d
961 (1983) (the authority to tax is " 'a fundamental attribute of sovereignty which
the tribes retain unless divested of it by federal law or necessary implication of
their dependent status.' " (quoting Colville, 447 U.S. at 152)); Iowa Mut. Ins. Co.
v. LaPlante, 480 U.S. 9, 18, 107 S. Ct. 971, 94 L. Ed. 2d 10 (1987) ("Tribal
authority over the activities of non-Indians on reservation lands is an important
part of tribal sovereignty. . . . Civil jurisdiction over such activities presumptively
lies in the tribal courts unless affirmatively limited by a specific treaty provision or
federal statute.")

No. 84265-0-I/3

selling in Washington to either join the MSA and make annual payments or remain outside the MSA and make escrow deposits for "units sold"—measured by excise taxes collected by the State on tobacco products bearing "the excise tax stamp of the State." At the end of each calendar year, the State can avoid a downward adjustment of its annual cash payment from the PMs if it demonstrates it "diligently enforced" chapter 70.157 RCW against the non-participating manufacturers.

In 2001, following years of contentious litigation over cigarette tax rights, the State enacted legislation authorizing compact agreements between the State and Indian tribal governments. Cigarettes sold under the compacts have tribal, rather than state, tax stamps and have not been deemed to be subject to chapter 70.157 RCW's required escrow deposits. Following conflicting arbitration orders defining "units sold," the State sought declaratory relief in King County Superior Court to clarify its enforcement obligations and the definition of "units sold." The State also requested that the court vacate the 2004 arbitration panel's (2004 Panel) award, arguing the 2004 Panel's interpretation of "units sold"—that they include cigarette packs with tribal stamps—constituted facial error. The court denied the State's motion to vacate but agreed that tribal compact cigarette sales were not "units sold" and granted the State's motion for declaratory relief on the issue. The participating tobacco manufacturers appealed the court's declaratory judgment. The State cross-appealed the court's denial of its motion to vacate. Because we agree with the trial court's definition of "units sold" and with its conclusion that the 2004 Panel did not exceed its powers, we affirm.

3

FACTS

The Master Settlement Agreement

In 1998, forty-six states, the District of Columbia, and five United States territories (collectively referred to as the States) settled a lawsuit against four major cigarette manufacturers, the "Original Participating Manufacturers", resulting in a Master Settlement Agreement (MSA). Other cigarette manufacturers signed onto the MSA later and are referred to as "Subsequent Participating Manufacturers." Collectively, manufacturers that are party to the MSA are called "Participating Manufacturers," or PMs.

The MSA has been referred to as a "landmark" public health agreement. State v. R.J. Reynolds Tobacco Co., 151 Wn. App. 775, 778, 211 P.3d 448 (2009). The MSA requires the PMs make substantial annual cash payments to the States in perpetuity, based on their annual nationwide cigarette sales, to offset increased costs to the States' healthcare systems caused by smoking. In exchange, the States agreed to settle and release all past and future tobacco-related claims against the PMs.

The NPM Adjustment

Since the MSA's execution, over 50 tobacco manufacturers have agreed to be bound by its terms. Manufacturers that have not joined the MSA or agreed to its terms are referred to as "Non-Participating Manufacturers" (NPMs). During settlement negotiations, the PMs and the States recognized the need to impose corresponding financial obligations on these NPMs. The States feared the NPMs would become insolvent against future liability, and the PMs wanted to remain

4

No. 84265-0-I/5

competitive in the market. To that end, the MSA provides the States an incentive to enact and diligently enforce a "Qualifying Statute" that requires NPMs to deposit funds in escrow on qualifying units of tobacco sold within a State's borders.[2] This incentive is the "NPM Adjustment."

The NPM Adjustment provides for a potential reduction in the PMs' settlement payments in the event of an MSA-related market share shift to the NPMs above a specified threshold.[3] But a State can avoid a reduction in its annual payment if it demonstrates that it "diligently enforced" its Qualifying Statute for that calendar year. If an individual State diligently enforced the provisions of its Qualifying Statute during the year in question, the NPM Adjustment still applies to the PMs' collective MSA payments for that year, but that adjustment is reallocated to the States who failed to diligently enforce their Qualifying Statutes.[4] The diligent enforcement exception thus operates as a heavy incentive to the States to enact and enforce the provisions of their Qualifying Statutes.

---

[2] Unlike the PMs' annual cash payments, the NPM deposits remain in escrow and are released back to the NPM after 25 years without a judgment or settlement. The NPM deposit burden is meant to be similar to the PMs' MSA burden.

[3] An independent auditor, PricewaterhouseCoopers LLP, calculates the amounts of the PMs' annual payment and of the NPM Adjustment.

[4] Therefore, if a large number of States fail to diligently enforce their Qualifying Statute, the burden of the NPM Adjustment is more widely spread, reducing the share of the adjustment that each State bears. Conversely, if only a few States fail to diligently enforce their Qualifying Statutes, those States face a concentrated application of the NPM Adjustment and a greater reduction of their payments for that year, subject only to the limitation that the adjustment cannot be more than the total MSA payment received.

No. 84265-0-I/6

The MSA contains a "Model Statute" that, if enacted, constitutes a Qualifying Statute. The Model Statute requires tobacco manufacturers operating in a State to either join the MSA or make escrow deposits on "units sold." The Model Statute defines "units sold" as

> the number of individual cigarettes sold in the State by the applicable tobacco product manufacturer (whether directly or through a distributor, retailer or similar intermediary or intermediaries) during the year in question, as measured by excise taxes collected by the state on packs (or 'roll-your-own' tobacco containers) bearing the excise tax stamp of the State.

Washington's Qualifying Statute conforms to the Model Statute and was enacted in 1999, codified as chapter 70.157 RCW. See RCW 70.157.010(j) (defining "units sold").

Despite the enactment of Qualifying Statutes, the NPMs' market share continues to increase at significant rates. This shift in market share from PMs to NPMs has triggered the NPM Adjustment provision of the MSA for multiple years. Under the MSA, disputes over calculations of the NPM Adjustment for any given year are subject to arbitration.[5]

Compact Litigation

While most cigarettes sold in Washington are taxed by the State, some are exempt from state tax, such as sales on tribal reservations. RCW 82.24.295; RCW 43.06.455(3). Attempts by the State to impose and collect cigarette tax on cigarettes sold by tribal retailers to non-tribal consumers has a long and contentious history of litigation. Litigation and hostility between the State and

---

[5] The MSA does not define the term "diligent enforcement."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

tribes continued following the United States Supreme Court's decision in

Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134,

100 S. Ct. 2069, 65 L. Ed. 2d 10 (1980), in which the Court concluded that both

the State and the tribes had taxing authority over non-tribal consumers on

reservations. While Colville provided some clarity surrounding taxation of

cigarette sales on reservations, it did not address practical problems over who

would enforce and collect taxes on cigarettes sold to non-tribal consumers. The

tribes viewed the decision as unfair, given that overlapping taxes by both the

State and the tribes would put cigarette sales on reservations at a competitive

disadvantage as compared to non-tribal retailers.

In 2001, the Washington Legislature authorized the governor to negotiate

and enter into cigarette tax compacts with Washington tribes. RCW 43.06.455.

Under the compact system, cigarettes sold on reservations are subject to a tribal

excise tax—equal to that of the State—in lieu of the State excise tax. RCW

43.06.460. These cigarettes do not bear excise tax stamps of the State, but do

bear tribal excise tax stamps. RCW 43.06.455(4).

NPM Adjustment Arbitrations

1. 2003 NPM Adjustment Arbitration

In 2003, the States and the PMs disputed whether an NPM Adjustment

should be applied to the PMs' annual payment. The parties engaged in a lengthy

multi-state arbitration spanning several years. Some states settled, but others

faced contested hearings on whether they had diligently enforced their Qualifying

Statutes during the 2003 sales year. A panel of three retired federal judges

7

(2003 Panel) made findings for both a common case and for each individual state.

At the heart of Washington's case was the dispute over treatment of tribal sales. The 2003 Panel concluded that the Model Statute definition of "units sold" was unambiguous and that Washington tribal compact cigarettes were not "units sold" within the plain language of the statute. The 2003 Panel also found that Washington's decision to enter into compacts with the tribes was not done in a bad faith effort to avoid NPM escrow enforcement, but rather a legitimate effort to ameliorate State and tribal relations.

2.  2004 NPM Adjustment Arbitration

In 2004, the States and the PMs again disputed application of the NPM Adjustment. The dominant issue in the 2004 proceedings was whether each of the States diligently enforced its Qualifying Statute. Washington's case again focused on the question of whether tribal sales constituted "units sold" under its Qualifying Statute.

The 2004 Panel also concluded in its common findings that there was "no ambiguity in the definition of 'units sold' set forth in the MSA."[6] Despite the Panel's conclusion that the definition of "units sold" was unambiguous, it proceeded to consider an internal policy debate at the Washington Attorney

---

[6] The 2004 Panel also noted that the PMs' proposed interpretation of "units sold"—which would include all sales made via the internet, all tribal sales, and all sales that may otherwise constitute contraband—would "turn the meaning of 'Units sold' on its head by requiring the term to include cigarettes and [roll-your-own] containers not bearing the excise tax stamp of the State." The panel remarked that "[s]uch a reading would also render cigarette excise taxes collected by the State useless as a measure of 'units sold' in the State."

No. 84265-0-I/9

General's Office as relevant in interpreting the meaning of the term. The Panel then concluded in its Washington State-specific findings that compact cigarettes meet the statutory definition of units sold. The Panel noted that Washington did not simply repeal its cigarette tax by enacting the compact legislation, rather, Washington's legislation led compact tribes to collect the same tax the State imposed. The Panel reasoned that "[t]here [was] no evidence that absent the authorizing statutes, the state would have permitted the Tribes to impose and collect cigarette taxes." Therefore, the Panel concluded that "the tribal tax is a tax of the state and that the tribal stamp is a stamp of the state."

The Panel also determined that Washington failed to diligently enforce its Qualifying Statute during 2004. The Panel concluded that the following constituted lapses in diligent enforcement:

- Failure to "devote sufficient resources to escrow enforcement in 2004, and that the efforts of the three departments that played an enforcement role ([Department of Revenue], [Liquor and Cannabis Board], and [Office of the Attorney General]) were poorly coordinated."
- Failure to "make effective use of retail inspections as an escrow enforcement tool in 2004," including a failure to leverage Washington's minimum pricing law to enhance escrow enforcement.
- Failure to "create and execute an effective data collection and audit regimen."
- Failure to adequately detect widespread escrow avoidance schemes.

The Panel also found that the State failed to enforce escrow on compact cigarette sales but noted that this failure "was not determinative of the Panel's decision on diligent enforcement." The Panel explained that the State's "other lapses, independent of [its] ruling on compact sales, were determinative of the issue of diligence."

9

No. 84265-0-I/10

Present Case

Following the 2004 Panel's ruling, the State moved in King County Superior Court to vacate the Panel's ruling and for a declaratory judgment defining "units sold." The superior court denied the State's motion to vacate, but granted its motion for declaratory judgment. The court concluded that "units sold" did not include compact cigarettes and that its ruling "constitute[d] a binding declaration of the rights of the parties . . . under the MSA and Washington law pursuant to the Declaratory Judgment[s] Act and the Consent Decree."

The PMs appeal the declaratory judgment. The State appeals the order denying its motion to vacate.

ANALYSIS

We are presented with five questions on appeal. First, whether the issues in this case are subject to arbitration. We conclude that they are not. The MSA explicitly provides that either party may seek a declaratory order from the court defining any disputed term. Second, whether this matter presents a justiciable dispute. We conclude that it does. The State's interests are actual, genuine and opposing, direct and substantial, and a judicial determination would be final. Third, whether the State has standing under the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, to seek declaratory relief. Because the UDJA is a remedial statute meant to be construed liberally, we conclude that the State has standing. Fourth, whether the court erred in its interpretation of "units sold." We conclude that it did not. The definition of "units sold" in the statute is unambiguous and the court properly concluded that it does not include compact

10

cigarettes. Finally, whether the court erred in denying the State's motion to vacate. We conclude that it did not. Though the 2004 Panel committed error in its interpretation of "units sold," its award is not subject to vacatur because the Panel did not exceed its authority.

Standing

We must determine two threshold matters before reaching the merits of the parties' justiciability and standing arguments. First, whether the present matter is subject to arbitration under the MSA. We conclude that it is not. The MSA provides that NPM Adjustment disputes are subject to arbitration but the State's claim for declaratory relief concerning the meaning of a statute does not fall within the MSA's arbitration provisions. Second, whether the State is a "person" under the UDJA. We conclude that it is. The UDJA defines a "person" as, among other things, a "person," and RCW 1.16.080 provides that a "person," wherever used in the Code, can mean the State.

We are next presented with three questions related to standing. First, whether interpretation of "units sold" presents a justiciable controversy. Second, whether the State has standing to seek declaratory relief under the UDJA. And third, whether the State waived reliance on its alternative standing argument—the major public importance exception—by not raising it below. We conclude that this is a justiciable controversy and that the State has standing to seek declaratory relief under the UDJA. Because the State has standing, we do not reach whether the State has standing under the major public importance exception.

11

No. 84265-0-I/12

1.  Interpretation of the MSA's Arbitration Clause

The PMs assert that the language, "any dispute concerning the operation or application of any of the adjustments," encompasses the present dispute over the interpretation of "units sold," and therefore, this matter must be arbitrated. But this interpretation ignores the unambiguous, plain language of the arbitration clause.

Where a contract is unambiguous, contract interpretation is a question of law that we review de novo. Thomas Ctr. Owners Assoc. v. Robert E. Thomas Tr., 20 Wn. App. 2d 690, 699, 501 P.3d 608 (2022). Words in a contract are given their ordinary, usual, and popular meaning unless the agreement as a whole clearly demonstrates a contrary intent. Bellevue Square, LLC v. Whole Foods Market Pac. Nw., Inc., 6 Wn. App. 2d 709, 716, 432 P.3d 426 (2018). "An interpretation of a contract that gives effect to all provisions is favored over an interpretation that renders a provision ineffective." Snohomish County Pub. Transp. Benefit Area Corp. v. FirstGroup Am., Inc., 173 Wn.2d 829, 840, 271 P.3d 850 (2012). "Where one construction would make a contract unreasonable, and another, equally consistent with its language, would make it reasonable, the latter more rational construction must prevail." Byrne v. Ackerlund, 108 Wn.2d 445, 453-54, 739 P.2d 1138 (1987).

Section XI of the MSA contains the arbitration clause at issue and is entitled "Calculation and Disbursement of Payments." It provides:

> (c) Resolution of Disputes. Any dispute, controversy or claim arising out of or relating to calculations performed by, or any determinations made by, the Independent Auditor (including . . .

12

No. 84265-0-I/13

> any dispute concerning the operation or application of any of the adjustments . . . ) shall be submitted to binding arbitration before a panel of three neutral arbitrators, each of whom shall be a former Article III federal judge.

The PMs assert that the language "any dispute concerning the operation or application of any of the adjustments" encompasses the present dispute over the interpretation of "units sold," and therefore, this matter must be arbitrated. But this interpretation ignores the unambiguous, plain language of the arbitration clause. The arbitration clause states that it applies to disputes arising out of the calculations and determinations made by the "*Independent Auditor*"—not the legal meaning of the Qualifying Statute. And the language singled out by the PMs is not as broad as they suggest. Read in context, it confines to arbitration determinations made by the Independent Auditor concerning the operation or application of the adjustments. Again, the State's declaratory judgment claim does not concern review of the arbitrators' determination of diligent enforcement.

The PMs' interpretation also renders superfluous section VII, entitled "ENFORCEMENT." Section VII(c)(1) provides that

> any Settling State or Participating Manufacturer may bring an action in the Court to enforce the terms of this Agreement (*or for a declaration construing any such term ('Declaratory Order')*) with respect to disputes, alleged violations or alleged breaches within such Settling State."

(Emphasis added).

And section VII(a) states that

> [e]ach Participating Manufacturer and each Settling State acknowledge that the Court . . . shall retain exclusive jurisdiction for

13

the purposes of implementing and enforcing this Agreement and
the Consent Decree to such Settling State."[7]

When read together, the plain language of section VII further informs the scope of section XI's arbitration clause. Section VII(c)(1) explicitly authorizes either party to seek a declaratory order from the court defining any disputed term in the MSA. Because the State adopted the language from the Model Statute as its Qualifying Statute, section VII(c)(1) necessarily extends to the State's Qualifying Statute. Moreover, under section VII(a), the superior court has exclusive jurisdiction over MSA enforcement.[8] Because sections VII(a) and (c)(1) permit the State to seek a declaratory judgment, this issue is not confined to arbitration.

### 2. Definition of "Person" Under UDJA

The PMs contend that "person" as used in the UDJA must be construed strictly to only mean a "person" in the literal sense. But this interpretation runs contrary to the purpose of the UDJA.

The UDJA permits any "person" with affected interests to seek a declaratory judgment. RCW 7.24.020. It defines a "person" as "any *person*, partnership, joint stock company, unincorporated association or society, or municipal or other corporation of any character whatsoever." RCW 7.24.130 (emphasis added). The Code's general definitions section provides that the term "person," wherever it is used within the Code, may be construed to include

---

[7] "Court" is defined by the MSA as "the respective court in each Settling State to which th[e] [MSA] and the Consent Decree are presented for approval and/or entry as to that Settling State." Here, that court is King County Superior Court.

[8] Indeed, the PMs do not dispute that the court's previous rulings in 2006 and 2016 are binding on the parties.

No. 84265-0-I/15

Washington State. RCW 1.16.080. As a remedial statute, the UDJA is meant to be "liberally construed and administered." RCW 7.24.120; see also State v. Seattle Gas & Elec. Co., 28 Wash. 488, 68 P. 946 (1902) ("person" as used in remedial statute must be liberally construed to include corporation); Gontmakher v. City of Bellevue, 120 Wn. App. 365, 85 P.3d 926 (2004) (city was a "person" under anti-SLAPP statute even though statute mentioned "citizens"); State v. Jeffries, 42 Wn. App. 142, 145, 709 P.2d 819 (1985) (Department of Corrections was a "person" under the criminal restitution statute). Absent an express indication otherwise, we presume that the Legislature is aware of prior statutes and that any new legislation is consistent with prior legislation. Wright v. Miller, 93 Wn. App. 189, 197-98, 963 P.2d 934 (1998).

Here, the UDJA defines a "person" as a "person." It logically follows that the State can rely on the general definition of a "person" found in the RCW's general definitions. RCW 1.16.080(1) ("The term 'person' may be construed to include . . . this state."). The PMs' arguments in support of a narrow interpretation are unavailing. They assert that using the definition of "person" from RCW 1.16.080 violates the "general-specific rule" and the canon of expressio unius est exclusio alterius (express mention of one thing excludes all others). We disagree. First, the "general-specific rule" applies only where two statutes cannot be harmonized. Residents Opposed to Kittitas Turbines v. Energy Facility Site Evaluation Council, 165 Wn.2d 275, 309, 197 P.3d 1153 (2008). But the statutes here do not conflict and can be read together. And second, defining "person" as a "person" does not expressly exclude the State

15

where another statute defines a "person" as the State. Absent an express exclusion of the State, we presume that the Legislature is aware of the definition in RCW 1.16.080 and that the UDJA is consistent with prior legislation. Wright, 93 Wn. App. at 197-98. The term "person" as used in the UDJA includes the State.

3. Justiciability

The PMs contend that the present matter is not a justiciable dispute because the State does not have an "actual interest" and because this case is not subject to a final and conclusive judicial determination. We disagree.

We review orders, judgments, and decrees under the UDJA de novo. Borton & Sons, Inc. v. Burbank Props., LLC, 196 Wn.2d 199, 205, 471 P.3d 871 (2020). To bring an action for declaratory relief under the UDJA, a party must present a justiciable controversy and establish standing. To-Ro Trade Shows v. Collins, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001). RCW 7.24.020 confers standing to seek a declaratory judgment on any person "whose rights, status or other legal relations are affected by a statute." The UDJA "is designed to settle and afford relief from insecurity and uncertainty with respect to rights, status and other legal relations." DiNino v. State, 102 Wn.2d 327, 330, 684 P.2d 1297 (1984). "But 'before the jurisdiction of a court may be invoked under the act, there must be a justiciable controversy.' " Aji P. v. State, 16 Wn. App. 2d 177, 198, 480 P.3d 438 (2021) (internal quotation marks omitted) (quoting To-Ro Trade Shows, 144 Wn.2d at 411). A justiciable controversy is (1) an actual, present, and existing dispute, (2) between parties having genuine and opposing

16

interests, (3) which involves interests that are direct and substantial, rather than potential, theoretical, abstract, or academic, and (4) a judicial determination of which will be final and conclusive. To-Ro Trade Shows, 144 Wn.2d at 411 (citing Diversified Indus. Dev. Corp. v. Ripley, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)). Because the UDJA is a remedial statute, it is meant to be "liberally construed and administered." RCW 7.24.120.

Actual, present, and existing dispute. The PMs contend that the only actual dispute between the State and the PMs is a contractual dispute under the MSA over whether the State diligently enforced its Qualifying Statute. They also claim that this dispute cannot be "actual and present" because it is "an ongoing and potential future arbitrated dispute."[9] (Emphasis omitted.) This argument misses the mark. The State is not seeking a declaratory judgment that it diligently enforced its Qualifying Statute; it is seeking a declaratory judgment clarifying a disputed term in the MSA. That the parties disagree as to the meaning of "units sold" and are actively litigating this issue is sufficient to show an actual, present, and existing dispute.

Genuine and opposing interests. The PMs assert that the parties do not have genuine and opposing interests because any dispute over "units sold" is committed exclusively to arbitration. Again, this argument is unpersuasive. The parties clearly have opposing interests—the State has an interest in showing it

---

[9] The PMs also claim that "it is unclear whether or when future arbitrations will even take place." This argument does not survive close scrutiny. Given the interests at stake, the history of litigation, and ongoing litigation, it is almost certain that future arbitrations will take place.

17

was diligent to avoid a lower annual payment and the PMs have an interest in paying less money to the State. No scenario exists in which both parties prevail in an NPM adjustment.

Direct and substantial interests. The PMs claim that the State's interest in correctly enforcing the Qualifying Statute is insufficient to confer a right under the UDJA. They also assert that the State has no cognizable interest in a declaratory judgment against them because they are not subject to the provisions of the statute. Finally, the PMs contend that any interest in the interpretation of "units sold" would be speculative. But contrary to the PMs' assertions, this dispute plainly involves direct and substantial interests, rather than potential, theoretical, or abstract interests.

First, the State has a direct interest in enforcement of the Qualifying Statute—failing to properly enforce it would cost the State millions of dollars. The cases the PMs cite on this point are unpersuasive. Two are from other jurisdictions[10] and the PMs misconstrue the two Washington cases. In Stevens County v. Stevens County Sheriff's Department, the County challenged the constitutionality of the "Involuntary Treatment Act" (ITA), RCW 71.05.182, claiming it violated the Second Amendment to the United States Constitution and

---

[10] The PMs cite State ex rel. Edmisten v. Tucker, 312 N.C. 326, 323, S.E.2d 294 (1984) (judicial defendants—state court judges—and attorney general did not have opposing interests because judicial defendants "stand completely neutral to all legal claims and arguments brought before them.") and Foote v. State, 364 Or. 558, 563, 437 P.3d 221 (2019) (holding that " 'an abstract interest in the correct application or the validity of a law' " is insufficient to confer standing (quoting Morgan v. Sisters Sch. Dist. No. 6, 353 Or. 189, 195, 301 P.3d 419 (2013))).

due process rights. 20 Wn. App. 2d 34, 42, 499 P.3d 917 (2021). The court concluded that the County's interest in protecting the rights of unidentified individuals who were not named parties to the suit was not an interest protected or regulated by the ITA. Stevens, 20 Wn. App. 2d at 42-43. But here, the State is seeking a declaratory judgment to define its *own* rights—not the rights of others.

The PMs' reliance on Pasado's Safe Haven v. State, 162 Wn. App. 746, 259 P.3d 280 (2011) is similarly misplaced. In Pasado's, plaintiffs sought a judicial declaration invalidating a statute only in part. 162 Wn. App. at 749. The court declined to do so because partial invalidation of the statute would broaden its scope beyond that intended by the legislature. Pasado's, 162 Wn. App. at 761-62. The court reasoned that it could not rule on whether only part of the statute was constitutional because doing so would constitute an advisory opinion. Pasado's, 162 Wn. App. at 749.

Second, though the PMs are not explicitly named in the statute, the statutory scheme contemplates the MSA and enforcement of the scheme necessarily implicates the PMs. The PMs' argument that this suit is more properly brought against the NPMs is unconvincing.

Lastly, the State has a substantial interest in the interpretation of "units sold." If "units sold" is interpreted to include tribally tax stamped cigarettes, conflict between the State and tribes over tax regulation would surely ensue.

Final and conclusive judicial determination. The PMs maintain that a final and conclusive judicial determination is impossible because this dispute is

subject to arbitration.  But as previously addressed, the issues in this case are not subject to arbitration.  Moreover, the MSA specifically permits the State to seek a declaratory judgment defining any disputed term.  A declaratory judgment would end this recurring dispute[11] over whether "units sold" includes an obligation by the State to enforce the Qualifying Statute on tribally tax stamped cigarettes.  The interpretation of "units sold" presents a justiciable dispute.

4.  Standing

Having determined that the State satisfies the justiciability requirements, we turn now to standing.  Neither party specifically addresses the test for UDJA standing.  The PMs maintain that the State is not a "person" and is therefore precluded from seeking declaratory relief.  The State contends that because the PMs do not address the standing factors, they have waived this argument.  We disagree with both parties' contentions and conclude that the State does have standing under the UDJA.

Standing is a legal question that we review de novo.  Wash. Bankers Assoc. v. State, 198 Wn.2d 418, 455, 495 P.3d 808 (2021).  The justiciability requirements tend to overlap with the standing requirements under the UDJA.  Lakehaven Water and Sewer Dist. v. City of Federal Way, 195 Wn.2d 742, 769, 466 P.3d 213 (2020); Wash. State Council of County and City Emps. v. City of Spokane, 200 Wn.2d 678, 685, 520 P.3d 991 (2022) (" 'Inherent in these four requirements are the traditional limiting doctrines of standing, mootness, and

---

[11] The first two arbitrations resulted in two opposing views of the definition of "units sold."

20

ripeness, as well as the federal case-or-controversy requirement.' " (quoting To-Ro Trade Shows, 144 Wn.2d at 411)); To-Ro Trade Shows, 144 Wn.2d at 414 (the third justiciability requirement of a direct and substantial interest in the dispute encompasses the traditional doctrine of standing).

To establish standing under the UDJA, a party must demonstrate that: (1) the interest they seek to protect is within the zone of interests regulated by the statute in question, and (2) they have suffered or will suffer an injury in fact. Alim v. City of Seattle, 14 Wn. App. 2d 838, 852, 474 P.3d 589 (2020). Standing under the UDJA " 'is not intended to be a particularly high bar.' " Bass v. City of Edmonds, 199 Wn.2d 403, 409, 508 P.3d 172 (2022) (quoting Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc., 193 Wn.2d 704, 712, 445 P.3d 533 (2019)).

The State easily satisfies the zone of interest inquiry. The State is tasked with diligently enforcing its Qualifying Statute, chapter 70.157 RCW. If the State diligently enforces the statute, it will recoup a larger annual payment from the PMs and accrue in escrow funds from the NPMs to use for future settlements. This interest is squarely within the zone of interests protected by the statute, which aims to offset the "financial burdens imposed on the State by cigarette smoking" and for those burdens to "be borne by tobacco product manufacturers rather than by the State." RCW 70.157.005.

The State also meets the second part of the standing test, whether the challenged action has or will cause injury in fact. Because the State's annual payment from the PMs will be impacted if it must enforce its Qualifying Statute on

21

compact sales, it has proven an injury. The State satisfies the UDJA's standing requirements.

5.  Major Public Importance

On appeal, the State contends that even if it cannot satisfy UDJA standing, we should still reach the merits of its case because it is a matter of major public importance. The PMs counter that the State waived reliance on this argument by not raising it below. Because we conclude that the State has standing, we decline to address whether this case raises an issue of major public importance.

Interpretation of "Units Sold"

Having concluded that this matter is justiciable, we must next decide whether the court erred in interpreting "units sold" to exclude tribal compact sales not bearing a stamp of the State. As an initial matter, the State contends that the PMs waived their challenge to the court's interpretation of "units sold" because it is not identified in the PMs' issue statements. We disagree.

The parties' main dispute in this matter is whether "units sold" includes cigarettes sold under the tribal compact system. The PMs contend that defining "units sold" implicates some sort of fact finding or factual consideration appropriate only for the arbitration panel. They assert that the court erred by engaging in "abstract and advisory statutory construction." We conclude that the court correctly interpreted "units sold."

We review de novo a trial court's entry of declaratory judgment where the court made no findings of fact and its conclusions of law involve interpretation of

No. 84265-0-I/23

statutes.  Nollette v. Christianson, 115 Wn.2d 594, 600, 800 P.2d 359 (1990).

When interpreting a statute, " '[t]he court's fundamental objective is to ascertain

and carry out the Legislature's intent, and if the statute's meaning is plain on its

face, then the court must give effect to the plain meaning as an expression of

legislative intent.' "  Hanson v. Carmona, 1 Wn.3d 362, 373, 525 P.3d 940 (2023)

(alteration in original) (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146

Wn.2d 1, 9-10, 43 P.3d 4 (2002)).  " 'Statutes must be interpreted and construed

so that all the language used is given effect, with no portion rendered

meaningless or superfluous.' "  Assoc. Press v. Wash. State Leg., 194 Wn.2d

915, 920, 454 P.3d 93 (2019) (quoting Whatcom County v. City of Bellingham,

128 Wn.2d 537, 546, 909 P.2d 1303 (1996)).  If a statute is clear on its face, "we

are 'required to assume the Legislature meant exactly what it said and apply the

statute as written.' "  Hobbs v. Hankerson, 21 Wn. App. 2d 628, 632, 507 P.3d

422 (2022) (internal quotation marks omitted) (quoting HomeStreet, Inc. v. Dep't

of Revenue, 166 Wn.2d 444, 452, 210 P.3d 297 (2009)).

As to the issue of waiver, the PMs devote much of their briefing to

explaining why they disagree with the court's interpretation of "units sold."

Though the PMs' issue statements could have been more clearly phrased, the

State cannot justly argue that it was not aware of the PMs' arguments.  This

issue is not waived.

As to the statute, neither party disputes—and the court and the 2004

Panel concluded—that the statute is unambiguous.  The statute provides that

23

No. 84265-0-I/24

> "[u]nits sold" means the number of individual cigarettes sold in the State by the applicable tobacco product manufacturer (whether directly or through a distributor, retailer or similar intermediary or intermediaries) during the year in question, as measured by *excise taxes collected by the State* on packs bearing the *excise tax stamp of the State* or "roll-your-own" tobacco containers.

RCW 70.157.010(j) (emphasis added).

Because the statute is unambiguous, we apply it as written. As written, "units sold" under the statute means either (1) packs of cigarettes bearing an excise tax stamp of the State on which the State collects excise tax, or (2) "roll-your-own" tobacco containers on which the State collects excise tax. Cigarettes sold under the tribal compact system and bearing the excise tax stamp of a tribe are not "units sold" as they do not bear an excise tax stamp of the State and the State does not collect excise tax on those sales. See RCW 43.06.455(3), (5) (tribal tax is in lieu of state tax, compact cigarettes bear a tribal tax stamp, and the tribe collects tax revenue).

This case involves a fundamental misunderstanding of tribal sovereignty and the tribes' independent authority to tax. The PMs contend that there is no material difference, as a matter of statutory construction, between how the court and the 2004 Panel interpreted "units sold." They are wrong. Though the Panel initially determined that "units sold" meant cigarettes "bearing the excise tax stamp of the State," it later elaborated that it believed tribal stamps were State stamps because, the 2004 Panel said, "Washington authorized compact tribes to collect the same tax that the state imposes." It further explained that "[t]here is no evidence that absent the authorizing statutes, the state would have permitted the tribes to impose and collect cigarette taxes." The Panel's interpretation

grossly misunderstands Indian law and ignores basic principles of tribal sovereignty. The State cannot "authorize" the tribes to impose taxes—the tribes possess the inherent authority to do so. Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 137, 102 S. Ct. 894, 71 L. Ed. 2d 21 (1982) ("The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management. . . . [I]t derives from the tribe's general authority, sovereign, to control economic activity within its jurisdiction."). Contrary to the PMs' belief, the tribes are separate sovereigns independently collecting their own tax—they are not the State's tax collector.

The PMs also contend that the court erred in disregarding the "factual context" of the Panel's interpretation. But this argument ignores a central tenet of statutory interpretation. After the Panel concluded that there was "no ambiguity" in the definition of "units sold," it should not have looked to an internal policy debate at the AG's office to shape its interpretation. That internal debate was wholly irrelevant to the issue of statutory interpretation. The plain language of the statute is clear and determinative of this issue—the court did not err in its interpretation of "units sold."

## Vacatur

The parties disagree whether the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-14, or the Washington uniform arbitration act (WUAA), chapter 7.04A RCW, applies here. We need not determine which law applies to settle this issue. Regardless of which law applies, the court did not err in declining to vacate the award because it correctly concluded that the Panel did not exceed its authority.

25

Under Washington law, "[c]ourts will review an arbitration decision only in certain limited circumstances, such as when an arbitrator has exceeded [their] legal authority." Int'l Union of Operating Eng'rs v. Port of Seattle, 176 Wn.2d 712, 720, 295 P.3d 736 (2013). "To do otherwise would call into question the finality of arbitration decisions and undermine alternative dispute resolution." Int'l Union of Operating Eng'rs, 176 Wn.2d at 720. Our review of an arbitrator's award is "limited to the same standard applicable in the court which confirmed, vacated, modified, or corrected that award." Salewski v. Pilchuck Veterinary Hosp., Inc., 189 Wn. App. 898, 903, 359 P.3d 884 (2015). We review only whether one of the statutory grounds to vacate an award exists. Salewski, 189 Wn. App. at 903-04. The party challenging the award bears the burden of showing such grounds exist. Cummings v. Budget Tank Removal & Env't Servs., LLC, 163 Wn. App. 379, 388, 260 P.3d 220 (2011).

RCW 7.04A.230 prescribes narrow circumstances for vacatur of an arbitral award. One of those circumstances is where the "arbitrator exceeded the arbitrator's powers." RCW 7.04A.230(1)(d). In considering a motion to vacate on this ground, we examine whether there is an error of law " 'on the face of the award' " that goes to the arbitrator's decision. Salewski, 189 Wn. App. at 904 (quoting Federated Servs. Ins. Co. v. Pers. Representative of Estate of Norberg, 101 Wn. App. 119, 123, 4 P.3d 844 (2000)). But "the facial legal error standard is a very narrow ground for vacating an arbitral award." Broom v. Morgan Stanley DW Inc., 169 Wn.2d 231, 239, 236 P.3d 182 (2010). "Limiting judicial review to the face of the award is a shorthand description for the policy that

26

courts should accord substantial finality to arbitrator decisions." Estate of Norberg, 101 Wn. App. at 123. " 'The error should be recognizable from the language of the award, as, for instance, where the arbitrator identifies a portion of the award as punitive damages in a jurisdiction that does not allow punitive damages.' " Salewski, 189 Wn. App. at 904 (quoting Cummings, 163 Wn. App. at 389). The example provided in Salewski was indeed more than an ordinary legal error, but one contrary to the long established public policy of Washington that "recovery of punitive damages is contrary to the public policy of the State and will not be allowed unless expressly authorized by statute." Kennewick Educ. Ass'n v. Kennewick Sch. Dist. No. 17, 35 Wn. App. 280, 282, 666 P.2d 928 (1983) (citing Spokane Truck & Dray Co. v. Hoefer, 2 Wash. 45, 25 P. 1072 (1891)). Barring a statutory basis for vacating an arbitration award, the general rule is that "[a]rbitrators, when acting under the broad authority granted them by both the agreement of the parties and the statutes, become the judges of both the law and the facts . . . ." N. State Const. Co. v. Banchero, 63 Wn.2d 245, 249, 386 P.2d 625 (1963).

The FAA permits similarly narrow grounds for vacatur. Compare RCW 7.04A.230 with 9 U.S.C. § 10(a). One ground is "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). In determining whether the arbitrators " 'exceeded [their] powers,' " the party seeking relief bears "a heavy burden." Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569, 133 S. Ct. 2064, 186 L. Ed. 2d 113 (2013) (quoting 9 U.S.C.

27

No. 84265-0-I/28

§ 10(a)(4)).  "It is not enough for petitioners to show that the Panel committed an error—or even a serious error."  Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 671, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010).  "Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits."  Oxford Health, 569 U.S. at 569 (quoting E. Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000)).

"It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] [their] own brand of industrial justice' that [their] decision may be unenforceable."  Stolt-Nielsen S.A., 559 U.S. at 671 (some alterations in original) (quoting Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509, 121 S. Ct. 1724, 149 L. Ed. 2d 740 (2001)).  " '[I]t must be clear from the record that the arbitrators recognized the applicable law and then ignored it.' "  Biller v. Toyota Motor Corp., 668 F.3d 655, 665 (9th Cir. 2012) (quoting Lagstein v. Certain Underwriters at Lloyd's, London, 607 F.3d 634, 641 (9th Cir. 2010)).  If a reviewing court concludes that the arbitrator exceeded their authority, they have discretion over whether to vacate the award. 9 U.S.C. § 10(a) (stating the court "may" vacate an award).

The test for whether the arbitrator exceeded their power is similar under both the WUAA and the FAA.  Both are intended to be narrow means of vacating an arbitration award, though the FAA appears to impose a stricter standard. Rather than requiring error "on the face of the award," the FAA requires a party to

28

show that the arbitrator understood the law and then ignored it in favor of dispensing their own brand of justice.

Here, the 2004 Panel did not exceed its power under either test. Although the Panel committed an error of law in misinterpreting the Qualifying Statute, it does not amount to the sort of legal error justifying vacatur of an arbitration award. The 2004 Panel reached its conclusion based on its interpretation of evidence of a debate within the AG's office. This is precisely the sort of decision by an arbitrator that a court may not revisit because it goes beyond the face of the award. "In deciding a motion to vacate, a court will not review the merits of the case, and ordinarily will not consider the evidence weighed by the arbitrators." Estate of Norberg, 101 Wn. App. at 123-24. Moreover, this error did not underpin the Panel's final decision; the Panel stated that its interpretation was "not determinative" of its decision that Washington State did not diligently enforce its Qualifying Statute and that other lapses in enforcement efforts formed the basis of the decision. Under the state standard, an erroneous interpretation based on arbitration evidence that was not determinative of the Panel's ultimate decision is not facial error and does not support a conclusion that the arbitrators exceeded their powers. And under the federal standard, the same holds true: a nondeterminative error is insufficient to show the arbitrator exceeded their power. The State makes no other challenges to the Panel's other findings supporting its decision—likely because the evidence of its failure to diligently enforce was so

29

No. 84265-0-I/30

overwhelming. Thus, under either the state or federal standard, the Panel did not exceed its power.[12]

As an alternative argument, the PMs contend that to the extent the WUAA and FAA dictate different results, the FAA preempts the WUAA. "Determination of whether the FAA preempts a state statute that otherwise applies to a transaction generally requires a two-part analysis in which we consider (1) whether the FAA applies to the transaction and if so, (2) whether the state statute conflicts with the FAA." Satomi Owners Ass'n v. Satomi, LLC, 167 Wn.2d 781, 797, 225 P.3d 213 (2009).

Because the FAA and the WUAA do not conflict, and the analysis under either yields the same result, we decline to consider the PMs' preemption argument.

Affirm.

_____
Smith, C.J.

WE CONCUR:

_____
Birk, J.

_____
Chung, J.

---

[12] Because the Panel did not exceed its power, we need not address the PMs' argument that a party "must show prejudice as a condition of relief from [an] arbitration award." However, we note that the PMs misquote the standard introduced in Saleemi v. Doctor's Assocs., Inc., 176 Wn.2d 368, 292 P.3d 108 (2013). In Saleemi, our Supreme Court concluded that "a party *who fails to seek discretionary review* of an order compelling arbitration[] must show prejudice as a condition of relief from the arbitration award." 176 Wn.2d at 380 (emphasis added). Contrary to the PMs' assertion, this authority does not support that this standard applies any time a party seeks relief from an arbitration award.

30